## ELIAS *v.* RAMIREZ.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF ARIZONA.

No. 30.   Submitted November 5, 1909.—Decided January 3, 1910.

In this case this court, reviewing the evidence, reverses the territorial court and finds that there is evidence to show, with sufficient certainty, that an extraditable crime was committed by the person benefited thereby, and thus to satisfy the extradition procedure statute and justify the order of the commissioner committing the accused to await the action of the Executive Department on a requisition made for forgery under the extradition treaty with Mexico.

Although the statements of certain witnesses were unsworn to and therefore might not, under the state law, be admissible before a committing magistrate, under the extradition statute they are receivable by the commissioner to create a probability of the commission of the crime by the accused.

90 Pac. Rep. 323, affirmed.

THE facts are stated in the opinion.

*Mr. A. C. Baker,* for appellant.

*Mr. William Herring,* for appellee.

MR. JUSTICE MCKENNA delivered the opinion of the court.

Appellee was arrested as a fugitive from justice in pursuance of the provision of a treaty of extradition between Mexico and the United States, and, after a hearing before John H. Campbell, judge of the district court of the first judicial district of Arizona, sitting as a commissioner in extradition proceedings, he was committed, on the charge of forgery and the utterance of forged papers, to the custody of the United States marshal for Arizona, to abide the order of the President of the United States in the premises. Upon his petition to the Supreme Court of the Territory for *habeas corpus* he was discharged from custody, and from the judgment of the court the case is here on appeal.

The court decided that the offense charged is within the terms of the treaty between the United States and Mexico, "that the committing magistrate had jurisdiction of the subject-matter and the accused," and that the complaint was sufficient. The court, however, held that there was not sufficient legal evidence to establish the fact of forgery, and that, therefore, "the judge of the district court exceeded his jurisdiction in holding the petitioner (appellee) for extradition." This ruling constitutes the question in the case.

The complaint, summarized, is that Ramirez forged certain railroad wheat certificates, which purported to have been issued by the Southern Pacific Company to show the true weight of certain carloads of wheat shipped from the United States to Mexico, and had the further purpose to show the amount of custom duties to be paid to Mexico. The certificates, in order to appear authenticated, it is alleged, purported and were intended to show, that they were signed or sealed or stamped by the railroad company with a seal or stamp containing the words "Gross Weight, Tare, Net Weight," and that the true gross, tare and net weight of the wheat in each.

of the cars were inserted by the company after those words, and that the certificates were initialed with the letters "G. W. B."

It is alleged that the certificates were not so authenticated by the company or any one in its employ, and did not show the weight of the wheat, but showed that there was much less than the true weight. It is alleged also, with the usual repetition, that Ramirez forged the stamp and seal and the initials "G. W. B.," and did "use and utter" the certificates and presented them "to the custom house of the government of Mexico and the officials thereof," at the town of Nogales, "as true and genuine wheat certificates of the said railroad company, and as showing the true weight contained in the said cars."

There were two importations of wheat from Nogales, Arizona, to Nogales, Mexico, in the name of E. Ramirez. The manifest or request for importation was made to the proper officers at Nogales, Mexico, in the name of and for E. Ramirez. It was the duty of the Mexican inspectors of customs to inspect and weigh the wheat, in order to compute the proper amount of duties. One of the importations was inspected by one Manuel Rosas, the other by one Francisco Enriquez, both of whom were implicated in the prosecution in Mexico for the crimes of fraud against the Federal treasury and forgery of private seals.

Rosas testified that he examined the interior of the cars in a superficial manner, "satisfying himself by opening a sack that said cars contained the merchandise represented." He did not weigh the merchandise, because it came billed in carload lots, and "did not come designated as to so many bundles, and also because the custom house lacked the proper scale facility." He testified that "the railroad of Sonora issued to the applicants a ticket with the seal of the office without any signature, bearing thereon, indicated in lead pencil writing, the number of the respective cars, the net weight, and the gross weight It was so done in this case,

that he compared the data upon the tickets with reference notes with those presented by the customs agent, and, finding them to correspond with each other, he had no objection in authorizing, over his own signature, the correctness of the same and order it 'dispatched.'" As soon as the tickets, he further testified, are compared with the applications they are destroyed, and that he did not know what had become of them in this case. He further testified that the applications were delivered to him by the custom house collector, which applications manifested the weight of the merchandise to be imported, and, "this being done, the manifest passed into the possession of the revisors, who solicit the railroad ticket from the interested parties for the purpose of verifying the respective comparisons." The person of whom he "asked for the tickets was Mr. Manuel Ramirez, who was in charge of the customs department of the house." Further testifying, he said that he did not know the origin of the tickets "by their form of writing;" that he did not find in any of them any erasures nor any trace of alteration, and could not tell "even vaguely the namé of the employés who wrote the tickets;" that he did not know whether any person was present "when the corresponding tickets were delivered to him;" that he had no knowledge from "private sources or otherwise of Mr. Cerilo Ramirez's connection with the customs agency that operates under his name." He recognized, from the books of the railroad exhibited to him, the seals to be the same used by the company to express the weight, not recollecting having personally seen the books. Explaining how he "erred," he testified that it was because he did not go personally to the offices of the railroad to compare the true weight at those offices, but instead relied on the tickets presented by Manuel Ramirez, "which were ferged, in the sense that the said Ramirez personally or in accord with some employé of the railroad" forged the tickets, "making use of the seals of the railroad."

Francisco Enriquez testified substantially to the same

effect, though in some parts more fully. He testified that the tickets came approved by Mr. G. W. Bowman, chief of the station of the Sonora Railroad. He, however, did not know, he said, the handwriting of Bowman "to the extent of being able to identify the same to a certainty," because "the tickets in question only bring numbers, made in great haste, setting forth the number of the car, the gross weight, the net weight, and the tare calculated in pounds," of which he "made the computation into kilos."

Ignacio Alleo testified that he was a private employé of the firm under investigation, and served for five years as freighter for the firm or house; that his duty was to receive the loose freight from the American side, delivered to him at Nogales, Arizona, to place the same in the cars which convey it south; that in doing so he takes note of the number of bundles, marks, countermarks, weights and other memoranda which serve to form the applications for shipment; that said data are made on loose papers, which he delivers to Manuel Ramirez, who makes out the applications for shipment; that "Ramirez is also occupied in making the applications for exportation, reimportation, more properly exportation;" that he, the witness, had no other connection with the direct importation than to copy some applications for shipment; that when he came to the house, five years ago, Manuel Ramirez had been serving the house for a long time, and that Ramirez had "personal charge of the dealings with the employés of the custom house, all relative to importations;" that the head person in charge of the office "was Eduardo Ramirez, who had full power to act from the owner of the business, Cerilo Ramirez; that up to three years ago Alberto Masarenas kept the accounts of the house, since then he did not know who had, but that the cash accounts, he understands, were kept by Mr. Escobara."

Ignacio Escobara had testified before, but he would not ratify his former testimony in all respects, he said, because it was given "under the belief that his gratitude towards his

employer compelled him to do so," and that after mature
consideration he realized that he was not required "to tell
an untruth in a proceeding which may stain his honor, and
for that reason he was disposed to tell the truth." And he
testified that from the beginning of the proceeding against
Messrs. Campello he noticed the greatest uneasiness, excite-
ment and fear in Eduardo Ramirez, Luis Bartning and Cerilo
Ramirez; from that time they began to prepare themselves,
"fearing to become involved in the same manner as Messrs.
Campello and associates; that he plainly noticed the attitude
of the above gentlemen and the danger in which they were."
He further testified that "he saw and noticed their con-
duct, as well as listening to their conversation," and that
"the manner of preparing themselves consisted in making up
packages of correspondence and documents carefully selected
and packed in a wooden box which stood in a patio or court
during the day and disappeared at night without" his know-
ing what became of it; that he was under the impression that
it was taken to the American side, not being able to tell "from
whom he heard it in the office of the firm," but he believed
that he "heard it said there in conversation."

He further testified that the books of account and the copy
books of statement of expenses "appeared and disappeared
successively, being carried to and fro by Bartning personally,
who was the bookkeeper;" that at the beginning of Campello's
investigation, Alleo confessed to him that the house was very
much involved in the same manner as were Messrs. Campello;
that the person in charge of all transactions was Manuel
Ramirez; that Bartning is the brother-in-law of Ramirez,
"with whom he is strongly tied in business; the head of the
institution is Cerilo Ramirez, who commands as supreme
principal and owner of the establishment, and as such daily
attends said office, watching carefully the affairs and progress
of the house; during the absence of Cerilo his brother Eduardo
directs the house and is recognized by all as second chief, and
as Cerilo was tried for smuggling and his signature is not

accepted in custom house dealings, all official documents are signed by Eduardo Ramirez in his own name or through an agent representing himself in the documents as a custom house broker." He testified further that he "was told from the beginning that the cause of fear of Cerilo Ramirez and his associates in the present case proceeded from a fraud committed by them upon the Federal Treasury in like manner as that committed by Messrs. Campello, that is, by false and forged manifests of the weight of carloads of wheat imported by said house one year ago."

The record shows that Cerilo Ramirez, "being present for the purpose of undergoing a suppletory confrontation with Ignacio Escobara," and with "that of said Ramirez," referring apparently to some deposition or statement made by himself which is not in the papers, stated that he was "absent from Nogales, living in Lower California, and for that reason could not have been present after the detention of Campello," and stated further that he was "therefore ignorant of what disposition had been made of the books of account, correspondence and documents of the establishment of 'C. Ramirez,' to which Escobara" referred. He denied that he was recognized as agent of the house, and said that "if he left the name of C. Ramirez in the business it was with the object of not impairing the credit of the house, and on account of his brother being concerned, . . .. which business he transferred to his brother Eduardo, without executing in this case any special instrument." And he denied having had "previous knowledge of the fraud upon the Federal Treasury."

Manuel Ramirez was also put in "suppletory confrontation" with Escobara, whose testimony was read to him, as was that of C. Ramirez, and being "apprised of the discrepancies of both depositions," said that what Escobara said was "not exact" when he said that he, Ramirez, was "in collusion with the other, Messrs. Ramirez, in trying to conceal the books and correspondence of the business." The rest of his testimony is as follows: "He does not know where they (the books and

correspondence) are and says that their chief was Mr. Eduardo Ramirez, ignoring (?) to date if the payment has been made in full of the duties upon the importation of wheat, because his duties were only to draw the papers for the importation through the custom house."

He was called upon a second time to testify and he was asked if he personally copied the tickets or memoranda of the weight of the cars of wheat from the sheets in which the employés of the railroad noted the weight of bundles. He answered that sometimes he did, but not in the present case, he did not remember; that his brother Eduardo Ramirez attended to the loading and giving of weights, but that he in his brother's absence would sometimes attend to this branch. And further, that he could not explain the discrepancy between the weights of the bundles in question and those shown in the respective books of the railroad company.

It appears that the frauds upon the revenue charged to E. Ramirez amounted to $11,944.94. The depositions were taken in proceedings instituted in Mexico under its laws as the basis for an application for the extradition of Eduardo Ramirez, and were attested by the officers of the tribunal to whom the case was assigned, and that tribunal, after citing the applicable law and its conclusion, and considering that "the *corpus delicti* of fraud against the Federal Treasury and undue use of private seals" had been proved, and that it constituted forgery under the laws of Mexico, and was within the provisions of the treaty between that country and the United States, concluded as follows: "Let a petition issue with the proper evidence to the Secretary of State and Foreign Affairs, so that through the conduct of the diplomatic agents accredited in the neighboring republic, steps be taken for the extradition of Eduardo Ramirez, and obtaining the same, to place at the disposal of this tribunal."

Appellant was commissioned by the Mexican ambassador as a proper person to present to the authorities of the United States of America a copy of the warrant of arrest in the

United States of Mexico and of the depositions upon which the warrant was issued, and, as agent of Mexico, to "receive the said Eduardo Ramirez from the proper authorities of the United States of America." We shall not further quote from the papers, as there is no question but that requisition had been duly made for the extradition of Ramirez. The evidence before the district judge consisted of the depositions, together with oral testimony that they would be admissible in evidence in the courts of Mexico, and in addition the ambassador to Mexico and the chargé d'affaires certified that they were "properly and legally authenticated, so as to entitle them to be received for similar purpose by tribunals of Mexico, as required by the act of Congress of August 3, 1882." There is also in the record a paper headed "Statement of the weight of the carloads of wheat imported by Eduardo Ramirez, made by this Federal tribunal by virtue of the data shown in the books of the railroads," and a large number of exhibits.

The district judge committed Ramirez to the custody of the United States marshal for the Territory of Arizona, to abide "the order of the President of the United States of America in the premises." The writ of *habeas corpus* under review was then issued by the Supreme Court of the Territory and appellee discharged from custody. It was ordered, however, that if an appeal should be taken to this court he should be remanded to the custody of the marshal, to be released upon giving bail in the sum of $25,000, under the provisions of rule 34. Bail was subsequently given and the appellee discharged from custody.

The Supreme Court of the Territory expressed the view that the writ of *habeas corpus* could not be made to perform the office of a writ of error, and that, therefore, if the district judge had jurisdiction of the subject-matter and of the accused and the offense charged was within the terms of the treaty of extradition, and there was before him "competent legal evidence on which to exercise his judgment as to whether

the facts are sufficient to establish the criminality of the accused for the purpose of extradition, such decision cannot be reviewed on *habeas corpus*." The court cited *Ornelas* v. *Ruiz*, 161 U. S. 502, 508, and *Bryant* v. *United States*, 167 U. S. 104. And considering further the extent of a court's power of review over the judgment of the committing magistrate upon the facts, said, "but such court is not to inquire whether the legal evidence of facts before the commissioner was sufficient or insufficient to warrant his conclusion," citing *In re Stupp*, 12 Blatch. 501; *Ornelas* v. *Ruiz, supra,* and *Terlinden* v. *Ames*, 184 U. S. 270. The cases cited establish the propositions expressed by the court, but the learned court's application of them to the facts of this record is challenged. The court expressed the opinion that all of the conditions of commitment were established, except that there "was no competent legal evidence of the fact of forgery itself of the documents in question." That is, that there was no legal evidence of the forgery of what are called in the complaint "railroad wheat certificates" and "tickets" in the depositions of the witnesses. We are unable to agree to this conclusion. They were either forged or issued by mistake, and the supposition of a mistake is precluded by the evidence. The books of the railroad showed the true weights; the mistake or forgery was in the certificates or tickets. Exclude the former and forgery is established. If a mistake was made, it is certainly strange that it should have escaped notice until the Mexican treasury had been defrauded of $11,944.94. Besides, the reparation for a mistake was payment of the amount in default, not by flight from the accusation of forgery and crime. Then, too, ample opportunity was given in Mexico to explain the certificates, but explanation was not attempted. It was not attempted in Arizona, and from these negative circumstances, as well as from the positive testimony of the witnesses, it certainly cannot be said that there was substantially no evidence to justify the judgment of the commissioner that a crime had been committed, and as little can it

be said that there was not probable cause to believe that the accused had committed it. We have set out the evidence somewhat fully. It shows that the Mexican treasury was defrauded by the "House of Ramirez" of $11,944.94, and that appellee was "second chief" of the house and the one to whom C. Ramirez had transferred it. It appears, therefore, that he was the principal, if not the only beneficiary, of the fraud. It is true that Manuel Rosas and Francisco Enriquez, the custom house revisors, stated that they received the "tickets" from Manuel Ramirez; but from the testimony of the latter and other evidence it may be reasonably concluded that accused acted in conjunction with him, in fact, prepared and directed the whole affair. It is certainly not out of the bounds of reason to suppose that he who was benefited by the fraud contrived and executed it, and not his subordinate or employé. It is, however, objected that there is no evidence in the record "tending in any way to prove that any of the alleged certificates were forged or altered or changed by any person whatsoever." Indeed it. is asserted by the appellee "that the evidence, so far as it proves or tends to prove anything, proves that the certificates were genuine certificates issued by G. W. Bowman, chief of the station of the Sonora Railroad." To complete these contentions a reference is made to the complaint, in which it is alleged that the certificates, in order to appear authenticated, purported to show that they were signed, sealed or stamped by the railroad, containing the words gross weight, tare, net weight, and initialed with the letters "G. W. B.," and if so worded and initialed would have been so authenticated as to have shown true weight of the wheat in the cars. There is no evidence, it is said, of these allegations, or that it was the duty of the custom house officer to accept any so-called weight certificates as evidence of the true weight of the wheat to be imported. It is probable that the Supreme Court of the Territory yielded to these contentions, and that they were the basis of its decision that there was no legal evidence before the commissioner of "facts tend-

ing to prove the commission of the offense charged, to wit,
the crime of forgery,   .   .   ."

We, however, cannot concur in these contentions, and,
without going over the evidence to show a precise or tech-
nical adaptation of it to the allegations, it is enough to say
that we think the evidence shows not only that a crime was
committed, but shows its character and by whom committed
with sufficient certainty and strength to satisfy the statute
and to justify the order of the commissioner committing the
accused to await the action of the executive department.

It is further contended that the statements of Rosas and
Enriquez were unsworn to, and because unsworn to were not
admissible in evidence; that "under the common law and
the law of Arizona the unsworn statement of no witness is
competent upon a preliminary hearing before a committing
magistrate," and would not justify a commitment for trial
in Arizona. It is hence contended that it was not sufficient
to justify the extradition of the appellee. *In re Egita,* 63
Fed. Rep. 972; *In re McPhun,* 30 Fed. Rep. 57; *Benson* v.
*McMahon,* 127 U. S. 457, are adduced to sustain the conten-
tion. The answer to the contention is that the statute pro-
viding for extradition makes the depositions receivable in
evidence and provides that their sufficiency to establish the
crime shall be such as to create a probability of the commis-
sion by the accused of the crime charged against him. This
is the principle announced by the cases cited by the appellee.

Other contentions are made but we do not think that they
need special mention.

> *Order reversed and the cause remanded with directions to
> proceed in accordance with this opinion.*