## UNITED STATES ex rel. KLEIN v. MULLIGAN, Acting Marshal.

District Court. S. D. New York.
Feb. 3, 1931.

Murray, Hollaman & Lockwood, of New York City (Edward H. Lockwood and Thomas Gregory, both of New York City, of counsel), for His Majesty's Consul General.

Max D. Steuer, of New York City (Ben Herzberg, of New York City, of counsel), for defendant.

KNOX, District Judge.

■ Some of the objections now advanced to the extradition of relator will be overcome

if the thought be borne in mind that extradition proceedings are not criminal in their nature, even though punishment may hereafter be imposed upon the relator in the demanding jurisdiction if he shall be convicted of the crime there charged against him. United States ex rel. Oppenheim v. Hecht (C. C. A.) 16 F.(2d) 955. If, then, it be recalled that evidence from England which was introduced upon the hearing before the Commissioner was admissible on this proceeding, even though it would not have been received had relator been charged with an offense against the laws of this country, Elias v. Ramirez, 215 U. S. 398, 30 S. Ct. 131, 54 L. Ed. 253, slight obstacle to his extradition will remain. This, too, may be removed by taking into account the fact that negative circumstances relating to the offense charged, as well as positive testimony bearing upon its commission, were doubtless considered by the Commissioner, and properly so. Elias v. Ramirez, supra. They may also receive attention here.

■ With these preliminary observations, it is to be said that the record supports the finding that relator has been satisfactorily shown to have been intimately associated with the operations and activities of Broad Street Press, Limited, as the same were carried on in the city of London. Not only did he live with Fraser, whose true name seems to have been Factor, but he spent a substantial portion of his time in the offices of the corporation, occupying the "Board Room" in association with Guest and Green, who were active in carrying out the policies of the company. Not only did relator do this, but he also gave instructions to French, a clerk of Broad Street Press, Inc., as to his duties in that behalf. He likewise "appeared taking an active part in the conduct of the business and in the correspondence." Furthermore, shortly before the corporation ceased to do business, vast sums of money extracted from its bank accounts through the medium of Wise, who had given relator a power of attorney, came into the latter's control, and were promptly transferred from London to New York to await his arrival. This latter event coincided with efforts on the part of London police authorities to apprehend the relator on a charge of complicity in a conspiracy to defraud in connection with the affairs of Broad Street Press, Inc. While such charge, as originally made, and as later amended, in and of itself, is no proof of wrongdoing on the part of Klein, the time at which it was made is not without a suggestion that his trip to this country had about it

some of the characteristics of a flight from England.

That Broad Street Press, Inc., was a fraudulent enterprise is hardly open to question. Its method of operation in issuing a tipster sheet which, for a time, recommended the purchase of relatively sound securities so as to gain a following, and its action when that object had been attained, of following up contacts with personal advice from the editor recommending the purchase of worthless stocks, is strikingly reminiscent of stock jobbing activities such as are frequently inquired into by the criminal branch of this court. Indeed, the "Finance" of Broad Street Press, Inc., as the same has been described, together with the manner of its distribution, appears to have had a purpose little short of identical with that revealed regarding the Wall Street Iconoclast, which figured prominently in the case of Rice et al. v. U. S. (C. C. A.) 35 F.(2d) 689. The fact that "Finance" was edited by some one who went under the assumed name of Norman D. Spenser recalls a similar arrangement that was in effect on the tipster sheet which was used by some of the defendants in the case of United States v. Beadon et al. (C. C. A.) 49 F.(2d) 64, in the sale of stock in an American mining company pursuant to a plan which a jury has pronounced fraudulent. As in the case last mentioned, the supposed editor of Finance wrote letters, and made telephone calls to the victims of Broad Street Press, Inc., advising the sale of sound securities, and the investment of their proceeds in stocks of a much different character. Furthermore, quite like other mail fraud cases with which this court is acquainted, Broad Street Press, Limited, when it had effected the sale of a customer's good securities, and such customer had put the money thus realized in the security then being recommended, made strenuous efforts to load him with further shares by setting them "aside" and holding them against a further remittance. In this connection, customers were told that the stock would shortly be listed on the London Stock Exchanges; that a group of financiers was endeavoring to buy control of the companies; that the stock would soon advance in price, and should not be sold until Spenser so advised. So far as appears, none of the representations materialized, and when customers wished to sell their holdings of the stocks, which now are said to be worthless, they could not do so, and were advised that Spenser had given up the editorship of "Finance" for reasons of "health."

In my opinion, Broad Street Press, Inc.,

at least over the period from April to October, 1930, and probably during its entire existence, was engaged in the execution of a fraudulent scheme. It is also my belief that Klein was a participant in the scheme.

But, says counsel for relator, assuming that these conclusions be correct, there is as yet no proof that Klein has any portion of the funds which Broad Street Press, Inc., fraudulently obtained from its customers. Beyond this, it is contended that the funds in his possession, for all that is shown in the evidence, may represent the lawful earnings of the company, and that money in an amount of more than a million dollars can hardly be said to be contaminated because of the fact that in the course of the company's business, funds to the extent of some 1,400 pounds, sterling, which may be said to have been obtained by fraud, have been traced into its general deposits.

The answer is, of course, that if I am correct in the conclusions set out above, there is good reason to believe that he participated in the money obtained from the defendants Stacy, Hedley, Turner, and Cochrane. It was between June 11 and 25, 1930, that Turner purchased stock in Vulcan Copper Mines, Limited, one of the companies said to be worthless, and it appears from the cashbook of Broad Street Press, Limited, that Klein received the sum of 10,000 pounds sterling on June 26, 1930, and 5,000 pounds on June 30, 1930. Quite conceivably, a part, if not all, of Turner's money was included in such payments. And, in so far as the money received by Klein came from sales of legitimate stock of customers of Broad Street Press, Inc., and which was used in the purchase of fraudulent stock, and at its instance, that too is tainted with fraud. While the total quantity of stock thus disposed of is not shown, it is reasonable to suppose that it is large. By this I mean, that 100,000 copies of Finance were published weekly, and with this distribution, common knowledge will justify the inference that Stacy, Hedley, Turner, and Cochrane are not the only readers of the paper who were similarly defrauded, and that, in the aggregate, the losses of the victims were in large figures. Moreover, if any of Klein's money was fraudulently obtained, and the same has been mixed with legitimate funds, it is not for this court to separate the good from the bad.

Upon the record as a whole, I think the evidence sufficiently blocks out the elements of the crime charged against the relator, Collins v. Loisel, 259 U. S. 309, 42 S. Ct. 469, 66 L. Ed. 956, and his writ of habeas corpus is dismissed, and he is remanded to the custody of the marshal.