## UNITED STATES ex rel. GEEN v. FETTERS, Marshal.

### No. M–290.

District Court, E. D. Pennsylvania.

Jan. 18, 1932.

William T. Connor and John R. K. Scott, both of Philadelphia, Pa., for plaintiff.

Middleton, Blakely & Richardson, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge.

A preliminary statement of what we understand to be the record status of this case may clear the decks for action and directly present the rulings to be made. The proceeding concerns one Harry Geen or Green.

The pre-lis situation, so far as concerns us, is that a scheme is averred to have been devised in London, England, to defraud unwitting investors in stocks, and was so far

successful as that a large number of people were so defrauded out of sums of money which in the aggregate sound almost fabulous. The money of which these confiding persons were so defrauded was turned over by the guilty parties to the custody of Geen and others, who received it knowing it to have been fraudulently obtained. In the vernacular Geen was thus the "fence." Geen and some others came to this country. Geen came to Philadelphia, and Pennsylvania thus became the state of asylum. In the viewpoint of those defrauded, Geen is thus a "fugitive from justice"; from his own viewpoint he is a visitor lawfully here with the right to the protection of our laws. Those who are averred to have fraudulently obtained the moneys received by Geen and who remained in England were there prosecuted, indicted, and convicted, but the conviction has been since reversed and set aside by the judgment of the Appellate Court on appeal regularly taken. Out of this situation arose the present proceedings. Pending the prosecution in England, the British Consul here applied for a warrant for the arrest of Geen under the provision of the treaties between the United States and Great Britain and the acts of Congress passed to enforce and carry out the provisions of treaties for the extradition of persons who are in this country charged with violations of the laws of another. The application was made to a judge of this court sitting in the capacity of a committing magistrate. The warrant issued and Geen was arrested.

We do not have present access to the record, but as we understand Geen being thus in the custody of the marshal has taken two steps towards regaining his liberty:

1. He has entered a motion addressed to the court sitting as a committing magistrate for his discharge on the ground that no just cause for his detention has been shown.

2. He has applied to this court for the allowance of a writ of habeas corpus on the ground that he is unlawfully deprived of his liberty.

The same question underlies each of these moves, making each dependent upon the other. If he is discharged after a hearing upon the warrant of arrest, he will have no need for a writ of habeas corpus because he will then be at liberty. If he is what we will call held for extradition, the petition for a writ of habeas corpus must be denied because he is in lawful custody. The real question in consequence is: Should Geen be held for extradition? For convenience we will call him the relator.

It is helpful to have in mind as a starting point that the relator is charged with no offense against our laws, state or national. Secondly, he is here under and with the full right to receive the protection of our laws, nor can he be taken from under this protection otherwise than in accordance with law. It is thus clear that we cannot adjudge him to be guilty of any offense, nor can we find that there is evidence of his guilt or "probable cause" in the sense of legal justification to hold him for trial for any offense. The cause in this aspect of it is coram non judice. Any state or sovereignty may, however, limit what is called the right of asylum by providing by law that one in the state, although under the protection of its laws, and guilty of no offense against them, may nevertheless be taken into custody to be removed into the jurisdiction of another state or sovereign to be there tried for an offense against its laws. Many practices have made us familiar with this. In Pennsylvania, for instance, a warrant may be issued by a magistrate of one county. It cannot of itself be served in another, but under the provisions of the law it can be there served if a magistrate of that county shall indorse upon it authority to so serve it. This is familiar to all Pennsylvania lawyers as "backing warrants."

We have another instance of the practice in the provisions of the Constitution of the United States for the return of fugitives from the justice of one state who are found in another. Const. art. 4, § 2, cl. 2. Another instance of the practice is that in the proceeding now before us under which, through what are called extradition proceedings, one who has sought asylum in one country may be turned over to the authorities of another to be tried for offenses there committed.

We have indulged in this long preamble to bring out the point that the question before us is primarily not a question of law but of diplomacy.

The United States under its treaty-making powers may make such agreements with a foreign government as may be satisfactory to both on the subject of the surrender by one to the other of those charged with crime. Such treaties, however, are not ordinarily self-enforcing, but each party to a treaty is bound, in the exercise of good faith, to provide by law for the machinery of enforcement.

This brings us to the treaties between the United States and Great Britain on the subject and the acts of Congress to carry them into effect. A system might have been provided which did not call for the intervention of the courts. If so, the courts would have been

concerned only when one who had been taken into custody and was thus deprived of his liberty appealed to the courts for a writ of habeas corpus or otherwise. The question would then be whether he was lawfully deprived of his liberty. The treaty and the law making power might, however, authorize and call upon the courts to use their process to arrest the person sought to be extradited and to certify whether, in the opinion of the court, such person was the proper subject of extradition proceedings. The latter is what has been done, and the sole function of the court is to issue arrest process and with the party before it determine and certify whether he is the proper subject of extradition. It is in this sense only that the question before us is a judicial one. What is thereafter done rests with the Executive acting through the Department of State. It is, because of this, that we have said that extradition is a question of diplomacy rather than of law. The treaty which thus underlies this proceeding is that of 1842 (8 Stat. 572), as supplemented in 1889 (26 Stat. 1508). It would be expected that there might be acts committed which had been denounced as crimes under the laws of one country which nevertheless would not be thought to be extraditable offenses by the other country. Because of this any extradition treaty would define the offenses which were within the treaty. This treaty defines as extraditable the offense of receiving moneys knowing them to have been fraudulently obtained. This is the very offense with which this relator is charged. It may be here interpolated that the offense known as conspiracy is not made an extraditable offense.

We may likewise pause here to discuss a point made in opposition to this extradition. All are agreed that the offense charged must have been made extraditable by the treaty, but it is confidently asserted on behalf of the relator that in addition to this the offense must be one not only under the laws of the demanding country and be made extraditable by the treaty, but must also have been made a crime by the laws both of the demanding country and of the asylum country. Beyond doubt there is support of this thought to be found in judicial expressions. Indeed, in many of the opinions accompanying rulings made this seems to have been taken for granted, and in some perhaps the treaty so provided as that of 1889 does in some instances provide. There is no clear-cut statement upon what the proposition is based. Whether there be such a provision in some of the earlier treaties we have not taken the time to inquire, but it is argued that it cannot be found (as to this offense) in the Treaty of 1889. That treaty makes the offense here charged extraditable without qualification. It is true that some other one or more offenses are so qualified. This instead of extending the provision to the offenses in connection with which it is not mentioned, it is further argued, would negative the thought of any such intention. It is likewise true that the treaty requires in all cases that the "evidence of criminality" be such as under the laws of the asylum state would justify the holding of the accused for trial for offenses there charged. This, however, it is asserted goes wholly to the question of the evidence of guilt of the offense charged and its weight, and regulates the burden of proof upon the question of "probable cause." It is not a definition of an extraditable offense. As the question presented is in no sense one of guilt but merely aside from that of identity, (1) whether the offense charged is extraditable, and (2) whether the evidence justifies the preliminary finding that the accused should be put upon trial, it is urged that the other question of whether the act charged to have been committed has been made an offense under the laws of the country of asylum, does not arise. Of course, if it be made by treaty an element of the extraditable offense, or if the act of Congress passed to carry the treaty into effect required it as a condition of extradition, it must be present, but otherwise it need not be. The Treaty of 1889, it is said, does not call for it. The treaty, however, does not of itself effectuate all its purposes. The law of the asylum country must provide the machinery for carrying it into effect, and if by inadvertence or otherwise before a warrant of arrest could issue something more than the treaty required was called for, the warrant could not lawfully issue without a compliance with the statute. If the purposes of the treaty were thus defeated, the injured country might denounce the treaty unless the law was changed, but the magistrate or court empowered by that law to issue a warrant must follow its provisions. It is said that the act of Congress (R. S. § 5270 [18 USCA § 651]) under which this warrant issued expressly limits our inquiries to the two mentioned. It is silent on the subject of the one now under discussion.

■■ The general subject has been so often and so thoroughly discussed that further discussion would lend only length. The question of whether the offense to be extraditable must be an offense under the laws of the asylum state, we leave where the cited cases

leave it. What is meant by the rule, even when applied, is that an act which is an innocent one under the laws of the asylum state will not be found to be an extraditable offense, although denounced as criminal by the demanding country. Verbal identity in the definition of the offense in the two countries is not demanded. It is enough if the act aside from its verbal description is regarded as criminal by the laws of each country. What is and what is not within the rule as laid down is not altogether clear. The adage that the receiver is worse than the thief is common to England and Pennsylvania. The laws of Pennsylvania make it an offense to receive stolen goods with knowledge of the theft. There are likewise various fraudulent transfers which are made criminal as affecting both grantor and grantee. Law as a science must differentiate acts. Robbery, larceny, and embezzlement are, however, nothing else than different forms of theft. Statutory embezzlement may include acts which would not be embezzlement at common law. Conspiracy may in itself be made a crime in one country but not in another unless followed by an overt act. There may thus be an absence of identity in the verbal definition of the same criminal act as found in the laws of the demanding and the asylum country, but if an act as described in a treaty has been made extraditable, it will not be held to be not so merely because the definition of the offense verbally differs from the definition of the same offense found in the law of the asylum country.

This phase of the discussion may be summed up in the comment that the law of Pennsylvania denounces the crime of "receiving moneys knowing them to have been fraudulently obtained" quite as nearly as the law of Illinois was found to do in Kelly v. Griffin, 241 U. S. 6, 36 S. Ct. 487, 60 L. Ed. 861.

■ Passing the points just discussed, we come to the real defense interposed in this case as presented in the very forcible argument addressed to us by counsel for the relator. It begins with the proposition that no one can be tried for an offense with which he has not been charged and proceeds to the fact that the relator has been charged with the receipt of moneys, all of which came into his hands before a named date, and that there is no evidence that any one had been defrauded of any moneys until after the date named. Indeed, the only transactions connected with the defendant were with one man who instead of losing money had in truth and fact made a profit, and further that these transactions were nothing more than the purchase and sale of investment securities of the type known as high class. The argument drawn from this as presented by counsel is unanswerable. The only question thus becomes whether the right presentation has been made. The fraud, the fruits of which the relator is charged with having received, was the concept of no common mind. It was based upon the proposition that to defraud those who trust you they must first be induced to confide in you. The plan in consequence was to at first to do what in itself was a legitimate business. When confidence had been thus created and customers had been secured, but not until then, was the trap to be sprung. The intended and foredoomed victims were lured to the place where the trap was to be sprung by bait, but there was no trap set until they had been attracted in large numbers. The scheme was none the less fraudulent from the beginning and fraudulent before in the loss sense there was any fraud. The reply to this is that to charge the relator with participation in such a scheme is to charge conspiracy, and this is not an extraditable offense. Whenever there is the participation of several persons in a criminal act there is an overlapping. The planning of a crime and agreement to take part in it is a conspiracy, and if the part of one is to act as the purse and caretaker of its fruits, such receiver is a conspirator and accessory as well. If the crime involves a robbery or larceny or the obtaining of the moneys of others through a fraud and money is obtained and received and such receipt has been made a crime and is extraditable, the receiver is not relieved because he has also been guilty of conspiracy. It is an accepted doctrine that the trial of an extradited defendant should be restricted to the crime for which extradited, and each country trusts the other to observe this doctrine.

The conclusion we have reached is in accord with that reached in the cases of U. S. ex rel. Klein v. Mulligan, 1 F. Supp. 635 order affirmed (C. C. A.) 50 F.(2d) 687, and Laubenheimer v. Factor[1] charged with the like offense with which Geen is charged and with the many cases which have been cited to us. The already overgrown length of this opinion will not permit a discussion of them, but we list a number of the many in the light of which we have made our rulings. These are:

1. The relator should be certified as the proper subject of extradition proceedings

---

[1] No written opinion filed in District Court. Order reversed 61 F.(2d) 626.

and be committed to await Executive action in accordance with the act of Congress.

2. The petition for a writ of habeas corpus should be denied.

Appropriate orders in accordance with this opinion may be submitted.

The cited cases to which reference has been made are as follows: Bryant v. U. S., 167 U. S. 104, 17 S. Ct. 744, 42 L. Ed. 94; Collins v. Loisel, 259 U. S. 309, 42 S. Ct. 469, 66 L. Ed. 956; Wright v. Henkel, 190 U. S. 40, 23 S. Ct. 781, 47 L. Ed. 948; Rocca v. Thompson, 223 U. S. 317, 32 S. Ct. 207, 56 L. Ed. 453; Bingham v. Bradley, 241 U. S. 511, 36 S. Ct. 634, 60 L. Ed. 1136; U. S. v. Greene (D. C.) 146 F. 803; Pennsylvania Criminal Code of 1860, §§ 120 and 130 (see 18 PS §§ 2864, 2428).