## UNITED STATES ex rel. HATFIELD v. GUAY, U. S. Marshal.

District Court, D. New Hampshire.
July 26, 1935.

Allie J. Connor, of Manchester, N. H., for Hatfield.

Ralph Davis (of McLane, Davis & Carleton), of Manchester, N. H., for the Canadian Government.

MORRIS, District Judge.

This proceeding arises upon the petition of Freeman Hatfield, seeking to be discharged from the custody of John M. Guay, United States Marshal for the District of New Hampshire.

Petitioner was arrested on a warrant issued by United States Commissioner Charles D. Barnard upon the request of Honorable Hugh Alexander Ford, British Consul General at Boston, Mass., charging that the petitioner is a fugitive from justice from the Dominion of Canada.

Hatfield is charged in two counts in the complaint, first, with the crime of obtaining money under false pretenses, and, second, the crime of larceny, committed in the Dominion of Canada. Extradition to the place of the alleged crimes is sought by the Dominion government.

There was a lengthy hearing before Commissioner Barnard, who found probable cause for holding petitioner for extradition, whereupon this writ of habeas corpus was filed seeking petitioner's release.

The court has heard at length, both orally and by brief, counsel for the contending parties.

The count in the complaint setting forth the crime of false pretenses, in brief, states the facts as follows: On March 18, 1931, the petitioner, at Ottawa, did then and there by false pretenses obtain $71,276.72 of his Majesty's money in the right of Canada by false pretenses, falsely representing that the Gypsum Queen had been sunk by an enemy submarine whereby the Canadian government was indebted to and owed Hatfield the sum of $71,276.72, whereas "in truth and in fact" the representations were false and fraudulent, and were known to be so when made by the petitioner, and it was in reliance upon petitioner's representation that Canada caused to be paid or paid in payment of the indebtedness the sum of $71,276.72.

The count in the complaint in relation to the crime of larceny charges that the petitioner on or about March 18, 1931, at Ottawa, "did then and there commit the crime of Larceny by the theft or stealing" of the sum of $71,276.72.

The uncertainty as to the date as shown by the qualifying "on or about" is due to the fact that, whereas the money in question is alleged to have been obtained on March 18, 1931, the check which was cashed by the bank was dated March 21, 1931.

The limits of the inquiry upon a writ of habeas corpus are defined and limited by the Supreme Court in the case of Fer-

nandez v. Phillips, 268 U. S. 311, 45 S. Ct. 541, 542, 69 L. Ed. 970. I quote from the opinion of Mr. Justice Holmes as follows: "The foregoing are general principles relating to extradition, but there are further limits to habeas corpus. That writ as has been said very often cannot take the place of a writ of error. It is not a means for rehearing what the magistrate already has decided. The alleged fugitive from justice has had his hearing and habeas corpus is available only to inquire whether the magistrate had jurisdiction, whether the offense charged is within the treaty and, by a somewhat liberal extension, whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty. Benson v. McMahon, 127 U. S. 457, 8 S. Ct. 1240, 32 L. Ed. 234; Re Luis Oteiza y Cortes [Oteiza v. Jacobus], 136 U. S. 330, 10 S. Ct. 1031, 34 L. Ed. 464; Bryant v. U. S. [Ex parte Bryant], 167 U. S. 104, 105, 17 S. Ct. 744, 42 L. Ed. 94; Elias v. Ramirez, 215 U. S. 398, 406, 30 S. Ct. 131, 54 L. Ed. 253."

The identification of the petitioner as the person charged is admitted and the jurisdiction of Commissioner Barnard has not been challenged. He was a United States Commissioner for the District of New Hampshire, duly authorized by the District Court for said district to issue warrants for the arrest of fugitives from justice of foreign governments between which and the United States there are treaties and conventions of extradition. 18 USCA § 651.

The next question is whether or not the crimes charged are within the treaty provisions between the United States and Great Britain.

An examination of this article 10 of the Webster-Ashburton Treaty of 1842, quoted at length in the case of Wright v. Henkel, 190 U. S. 40, 45, 23 S. Ct. 781, 47 L. Ed. 948, discloses that neither larceny nor obtaining money under false pretenses was under that treaty an extraditable offense. Malloy Treaties, Conventions, etc., p. 655 (8 Stat. 572, 576).

In 1889 the United States and Great Britain entered into a supplemental convention known as the Blaine-Paunceforte Convention, extending the provisions of article 10 to a number of offenses not included in the Treaty of 1842. Section 3 of article 1 sets forth the crime of larceny: "3. Embezzlement; larceny: receiving any money, valuable security, or other property, knowing the same to have been embezzled, stolen, or fraudulently obtained." Malloy Treaties, etc. p. 740 (26 Stat. 1508).

A Supplementary Extradition Treaty with Great Britain under date of December 13, 1900, known as the Hay-Pauncefonte Treaty, adds three classes to the list of crimes for which extradition could be demanded under the earlier treaty.

Article 1, § 11, reads as follows: "11. Obtaining money, valuable securities or other property by false pretenses." Malloy Treaties, etc. p. 781 (32 Stat. 1864).

It thus appears that both crimes alleged, larceny and obtaining money under false pretenses, are specifically named in the existing treaties operative in the demanding government and the United States.

The petitioner does not contend that the crime of false pretenses is not an extraditable offense under the treaty of 1900, but he does contend that the facts shown by the evidence do not establish the crime of false pretenses.

At the hearing before the United States Commissioner the petitioner moved at the close of the evidence for and on behalf of the demanding government, and again at the close of all the evidence, that the complaint be dismissed and that he be discharged, as the evidence offered by the demanding government and received by the commissioner in relation to facts or events occurring prior to March 18, 1931, was immaterial, irrelevant, and incompetent under the complaint and warrant.

One ground for petitioner's motion seems to be that there is a variance between the complaint and the evidence, and that such variance is fatal to the government's contention.

In the case of Glucksman v. Henkel, 221 U. S. 508, 512, 31 S. Ct. 704, 705, 55 L. Ed. 830, Mr. Justice Holmes says: "It is common in extradition cases to attempt to bring to bear all the factitious niceties of a criminal trial at common law. But it is a waste of time. For while, of course, a man is not to be sent from the country merely upon demand or surmise, yet if there is presented, even in somewhat untechnical form according to our ideas, such reasonable ground to suppose him guilty as to make it proper that he should be tried, good faith to the demanding government requires his surrender."

■ It is not the duty of this court in a hearing upon a writ of habeas corpus to

critically examine the laws of a foreign country with whose jurisprudence and criminal procedure it can have only a limited knowledge. Such a duty ought not to be assumed unless it is plainly required by the exigencies of the case. Pierce v. Creecy, 210 U. S. 387, 28 S. Ct. 714, 52 L. Ed. 1113.

Extradition treaties should be faithfully observed and interpreted with a view to fulfilling our just obligations to other powers, without sacrificing the legal or constitutional rights of the accused. Technical noncompliance with formalities of criminal procedure should not be allowed to stand in the way of a discharge of the international obligations of the government. In the instant case if it fairly appears that the petitioner has committed a crime of obtaining money under false pretenses technicalities should be brushed aside.

The crimes charged in the complaint, upon which the request of the demanding government for the extradition of the petitioner is predicated, arise out of the payment by the Canadian government of an award rendered by the Royal Commissioner Errol M. McDougall, appointed by the Governor General of Canada, to consider claims for damages to private property following the war with Germany. The fundamental document in which provision for the payment of claims considered and passed upon by Commissioner McDougall is found in the treaty of Versailles.

The petitioner avers that because his claim for damages for loss of the Gypsum Queen was heard and determined in a judicial proceeding, that therefore the matter is res adjudicata and not open to collateral attacks.

The testimony tends to establish that the initial proceeding on the part of the petitioner was a statement of his claim dated October 29, 1929, executed before a British Consul in Florida, in which he set forth that his schooner, Gypsum Queen, was torpedoed by a German submarine; and that later he gave false testimony before Commissioner McDougall in Boston, Mass.; that his petition for reparation passed through the usual channels provided by the applicable Canadian statutes, and after the same had been allowed, he went to Canada and obtained the money. That it was paid to his attorney Logan in Hatfield's presence is of no importance. If there was testimony before the United States Commissioner reasonably tending to establish that

Hatfield, through false and fraudulent statements set in motion in the United States, obtained the payment of money in Canada, the latter country has jurisdiction of the crime.

In the case of Ford v. United States, 273 U. S. 593, 47 S. Ct. 531, 71 L. Ed. 793, Chief Justice Taft in an exhaustive opinion quotes with approval the following from Moore's International Law Digest, vol. 2, p. 244: "The principle that a man who, outside of a country, wilfully puts in motion a force to take effect in it is answerable at the place where the evil is done, is recognized in the criminal jurisprudence of all countries. And the methods which modern invention has furnished for the performance of criminal acts in that manner has made the principle one of constantly growing importance and of increasing frequency of application." See, also, Hammond v. Sittel (C. C. A.) 59 F.(2d) 683; Commonwealth v. Schmunk, 207 Pa. 544, 56 A. 1088, 99 Am. St. Rep. 801; People v. Adams, 3 Denio (N. Y.) 190, 45 Am. Dec. 468; Queen v. Nillins, (1884) 53 LJMC. 157.

Petitioner, however, argues that the general principle above stated is not applicable to the facts of this case because between the time Hatfield testified in Boston and the date when the money was paid there was an intervening judicial proceeding and an award by the Canadian Commissioner. Petitioner's contention in this respect raises a legal question which is a matter of defense if the petitioner is brought to trial in Canada. Whether the proceedings before the Canadian Commissioner making the Hatfield award was judicial or clearly administrative is a legal question which the Canadian courts must determine wherever and whenever the defense of res adjudicata is raised.

However, as both parties have argued the question of a collateral attack upon the proceedings before Commissioner McDougall in Canada, it seems proper for me to express my views although, as above stated, I think the issue is one of defense if the petitioner is put upon trial. Counsel for the petitioner quotes in support of his contentions the following from Corpus Juris, vol. 34, p. 566: "It is no ground for impeaching a judgment collaterally that the testimony on which it was based was false or perjured, unless the fraud goes to the jurisdiction of the court. For this reason an action will not lie against a witness who

swore falsely in the action in which the judgment was rendered, or against the party who procured the judgment by suborning the witness or conspiring with him."

He cites other cases as follows: Eyres v. Sedgewicke, 18 Jac. 1 Roll. 981, 79 reprint 513; Cunningham v. Brown, 18 Vt. 123, 46 Am. Dec. 140; Demerit v. Lyford, 27 N. H. 541; Vance v. Burbank, 101 U. S. 514, 25 L. Ed. 929; Scotten v. Rosenblum (D. C.) 231 F. 357.

An examination of the foregoing citations discloses that in most if not all the cases the collateral attack was made for the purpose of setting aside a judgment previously rendered. Such is not the present proceeding whether the judgment in Canada was purely judicial or only administrative.

The question now presented is whether Hatfield should be returned to Canada to answer to a criminal charge growing out of the proceedings before Commissioner McDougall.

 Whether the proceedings in Canada were judicial or otherwise, it cannot be said that Hatfield has been in jeopardy in any former action. Cases are too numerous to mention wherein a prevailing party to litigation has been prosecuted for perjury committed at his trial. We see no reason why the same principle that applies to perjury should not be applicable to procuring property by false pretenses. See Allen v. U. S. (C. C. A.) 194 F. 664, 39 L. R. A. (N. S.) 385; Kuskulis v. United States (C. C. A.) 37 F.(2d) 241; Jay v. State, 15 Ala. App. 255, 73 So. 137; State v. Vandemark, 77 Conn. 201, 58 A. 715, 1 Ann. Cas. 161; People v. Sculley, 3 N. Y. Crim. Rep. 244; State v. Sargood, 80 Vt. 415, 68 A. 49, 130 Am. St. Rep. 995, 13 Ann. Cas. 367. In Kusnir v. Pressed Steel Car Co. (D. C.) 201 F. 146, Judge Ray states the rule as follows: "A judgment in a criminal prosecution constitutes no bar of estoppel in a civil action based upon the same acts or transactions, and conversely of a judgment in a civil action sought to be given in evidence in a criminal prosecution. 24 Cyc. 831, title 'Res Adjudicata,' and the numerous cases there cited, both English and American; 1 Greenleaf on Evidence, 587; 2 Wharton's Law of Evidence, 776; Wilson v. Manhattan Ry. Co., 2 Misc. 127, 20 N. Y. S. 852, affirmed 144 N. Y. 632, 39 N. E. 495." See, also, Greenbaum v. U. S. (C. C. A.) 280 F. 474.

My conclusion is that the question now before the court is not res adjudicata because of the proceedings before Commissioner McDougall in Canada whether that proceeding be held to be judicial or otherwise.

We next turn to the record to determine whether or not there was any substantial evidence before Commissioner Barnard from which he could reasonably find probable cause that Hatfield was guilty of obtaining money under false pretenses.

The direct testimony as to the cause of the loss of the Gypsum Queen comes from two members of the crew, Kenneth Stevens and Alexander Allison. Stevens testified that the ship ran into a storm; that the mast blew over; that the spar was cut away; that the rigging on the ship was rotten; and that he never heard anything said at the time or later about the ship being torpedoed. He further testified that he came back from Liverpool to New York on the same ship that brought Captain Hatfield back and that during this trip Hatfield never said anything to him about a submarine or torpedo.

Allison testified that he heard a crash and immediately went to the deck. The first mate told the captain that the foremast had gone overboard in the storm. He testified that there was no other vessel or submarine in sight and that what damage was done to the ship was caused by the crashing of the mast. He further testified that Hatfield hired him to swear that the ship was torpedoed; that he met Hatfield and Logan and they paid him $500 for signing a statement of seeing a submarine. Mr. Logan represented Allison, who is a colored African, and collected for him, for a loss of his clothes, $779.80.

Captain John A. Pratt, a sea captain with some acquaintance with Hatfield, met Hatfield in Liverpool when the rescue ship landed him in that city. He testified that he discussed with Hatfield the sinking of the Gypsum Queen and at no time during the conversation did Hatfield mention or suggest that his ship had been torpedoed. There was further testimony that Hatfield testified under oath in Liverpool before the board of trade August 4, 1915, a few days after the sinking of his ship, that the cause of the sinking was a sudden storm which tore away the main mast. At no time did he mention that its loss was due to a submarine or torpedo. There was evidence before Commissioner Barnard that in pre-

senting his claim Hatfield represented that his vessel was torpedoed by a German submarine; ·that he so testified before Commissioner McDougall in Boston; that his claim was allowed by the commissioner; and that he went to Ottawa and received cash in the sum of $71,276.72.

■ Upon this evidence Commissioner Barnard found probable cause that the money was obtained under false pretenses. Whether or not the testimony of the two sailors is worthy of belief is not for this court to settle. The weight of the evidence was for the commissioner's determination and is not subject to review upon this writ. Fernandez v. Phillips, supra.

With reference to this count in the complaint the writ must be dismissed and the petitioner remanded.

In view of the above decision, perhaps it is not essential in this proceeding to determine the legal question raised with reference to the count charging larceny, but in view of the fact that the petitioner can be tried by the demanding government only upon charges upon which extradition is granted (Greene v. United States (C. C. A.) 154 F. 401), it seems essential that I should express my views with reference to the complaint for larceny.

With respect to the charge of larceny, the petitioner contends that the crime which the demanding government here characterizes as larceny was not known as larceny between the two contracting powers at the date of the convention of 1889. When larceny was included as an extraditable offense in 1889, the Canadian law defining the crime was that set forth in the Revised Statutes of 1886, the pertinent provisions of which are as follows:

"Every larceny, whatever is the value of the property stolen, shall be deemed to be of the same nature, and shall be subject to the same incidents in all respects as grand larceny was before the distinction between grand and petit larceny was abolished. 32–33 V. c. 21, s. 2.

"Every one who commits simple larceny or any felony hereby made punishable in the same manner as simple larceny, is guilty of a felony, and, except in the cases hereinafter otherwise provided for, is liable to seven years imprisonment. 32–33 V. c. 21, s. 4. Also, 40 V. c. 29, s. 3."

In 1892 the Criminal Code of Canada was adopted, and as at present in force appears in Revised Statutes of Canada, vol. 1, chap. 36 (1927). The provisions of the Code under which extradition of the petitioner is sought reads:

"347. Theft or stealing is the act of fraudulently and without colour of right taking, or fraudulently and without colour of right converting to the use of any person, anything capable of being stolen, with intent,

"(a) to deprive the owner, or any person having any special property or interest therein, temporarily or absolutely of such thing or of such property or interest or

"(b) to pledge the same or deposit it as security; or

"(c) to part with it under a condition as to its return which the person parting with it may be unable to perform; or

"(d) to deal with it in such manner that it cannot be restored in the condition in which it was at the time of such taking and conversion.

"2. Theft is committed when the offender moves the thing or causes it to move or to be moved, or begins to cause it to become movable, with intent to steal it.

"3. The taking or conversion may be fraudulent, although effected without secrecy or attempt at concealment.

"4. It is immaterial whether the thing converted was taken for the purpose of conversion, or whether it was, at the time of the conversion, in the lawful possession of the person converting." Defendant's Exhibit A, pp. 70, 71.

I have great hesitancy in holding that the word "larceny" as used and understood in the Blaine-Paunceforte Convention of 1889 is broad enough to include money obtained by fraud. A more apt designation of the offense would have been, using the language of the treaty, "receiving any money * * * knowing the same to have been embezzled, stolen, or fraudulently obtained."

"Larceny" at common law had a well-defined meaning. The elements were trespass, asportation, and conversion to one's own use. As was said in the case of State v. Watson, 41 N. H. 533: "When the transfer of property is obtained, however fraudulent the intent may be, there is no trespass in the taking without which there can be no larceny or robbery. That where such credit is obtained by false pretenses the legislature have supplied a particular remedy."

The distinction is well pointed out in Corpus Juris, vol. 36, p. 778, in the following language: "The matter of passing title is the element which distinguishes the crime of larceny from that of obtaining property by false pretenses. If by trick or artifice the owner of property is induced to part not only with the possession, but also to vest the title in it in another, the crime. is false pretenses and not larceny; but if the owner parts with the possession only, still intending to retain the title, the taking by such means is larceny and not false pretenses."

The statutes of many· states have extended the meaning of the term "larceny" to include the wrongful conversion of anything that could be the subject of larceny at common law, even though the element of trespass is lacking. See N. H. Pub. Laws, c. 389, § 8. However, evidence is lacking that the term "larceny" as used in the Treaty of 1889 had been so extended. How far statutory alterations in the definition of crime may affect the operation of a treaty has not been definitely determined:. Mere changes in the description of an offense without changing its essential character are not material. Moore, Extradition, p. 526. Mere terminology is not material. Powell v. U. S. (C. C. A.) 206 F. 400, 401.

The offense charged in count 2 of the complaint is not known either in Canada or in New Hampshire as "larceny." The facts set forth constitute a crime under the Criminal Code of Canada adopted in 1892. The word "larceny" is not retained, but applicable provisions are found in the Code covering "larceny" as known at common law as well as "larceny" extended by statutory provisions. It is treated under the title "theft or stealing." Canadian Criminal Code, supra; Canadian Revised Statutes of 1906, chap. 146, pars. 344, 347.

The facts set forth constitute a crime under the laws of New Hampshire (Pub. Laws, c. 387, § 1), under the title "Frauds." It therefore appears that the facts set forth constitute a crime in the demanding country and the state of asylum although in neither do we find that it appears under the designation "larceny."

In the case of Cohn v. Jones (D. C.) 100 F. 639, it is held that where an extradition treaty uses general names, such as "murder" or "arson," in defining the classes of crime for which extradition may be granted thereunder, such names are not necessarily confined to their meaning at common law, but the question whether a given offense comes within the treaty must be determined by the law as it exists in the two countries at the time the extradition is applied for.

[8] It appearing that count 2 of the complaint sets forth an offense under the Canadian statute and also an offense under the laws of the state of New Hampshire, even though under different names, and treating the substance of the allegations as of greater importance than mere names, the petitioner should be returned to the demanding government to answer to the offense, whatever it may be called, set forth in the complaint.

As was said in the case of Factor v. Laubenheimer, 290 U. S. 276, 277, 298, 54 S. Ct. 191, 197, 78 L. Ed. 315: "The surrender of a fugitive, duly charged in the country from which he has fled with a nonpolitical offense and one generally recognized as criminal at place of asylum, involves no impairment of any legitimate public or private interest. The obligation to do what some nations have done voluntarily, in the interest of justice and friendly international relationships, * * * should be construed more liberally than a criminal statute or the technical requirements of criminal procedure."

My conclusion is that the writ must be discharged and the petitioner remanded to custody.