**UNITED STATES of America**

v.

**John Peter GALANIS, a/k/a Peter Galanis.**

**Civ. No. N–76–385.**

United States District Court, D. Connecticut.

March 8, 1977.

Raymond L. Sweigart, Asst. U. S. Atty., New Haven, Conn., for plaintiff.

Paul R. Grand, Grand & Ostrow, New York City, Mark A. Weinstein, Weinstein, Shields, Schaffer, Hirsch & Lev, Norwalk, Conn., for defendant.

## MEMORANDUM OF DECISION

NEWMAN, District Judge.

On February 6, 1973, a Canadian information was filed in Montreal charging defendant John Peter Galanis with defrauding Champion Savings Corp., Ltd. and its

creditors of securities valued at 1,600,000 Canadian dollars. On September 1, 1976, Government counsel applied to this Court, pursuant to 18 U.S.C. § 3184, which governs the extradition of persons in the United States to foreign countries, for a warrant requiring the defendant, an American citizen residing in Connecticut, to be brought before the Court for a hearing. Section 3184 requires that a hearing be held on the Government's application, and that if the Court finds probable cause to sustain the charge,[1] it shall certify that finding to the Secretary of State, who then takes the appropriate steps, according to the governing treaty or convention, to secure the extradition upon the request of the demanding government.

On November 23, 1976, the Court commenced the hearing required by § 3184.[2] After an adjournment prompted by defense counsel's request for additional time, the hearing was resumed on December 3, 1976. Initially, the Court heard testimony relating to motions filed by the defendant. The motions all seek the same relief—dismissal of the extradition proceeding with prejudice. The defendant argues for dismissal on the following grounds: (1) that the proceeding violates a prior agreement between the defendant and the United States Attorney's Office in the Southern District of New York, (2) that the proceeding is barred by the double jeopardy clause because the defendant has already been "proceeded against" in this country on the charge for which extradition is sought, and (3) that the United States and Canada have violated

defendant's Sixth Amendment right to a speedy trial. On the merits of the issue of probable cause, the defendant contends that the exhibits offered in support of the extradition request have not been properly authenticated and without these exhibits, evidence of probable cause is lacking.

The hearing lasted more than two days, during which testimony was taken from, among others, the Canadian official who directed that country's investigation of Galanis and Champion Savings, two Canadian lawyers qualified as expert witnesses on Canadian criminal procedure, and the two American lawyers who were principally responsible for the American securities fraud investigations that involved the defendant. Extensive briefs have been filed.

Before turning to the basic task required by § 3184—the determination of probable cause—the Court will rule on defendant's motions *seriatim.*

I. *Alleged Violation of Plea Agreement*

Defendant's first claim is that the extradition proceeding must be dismissed because it violates a prior agreement between himself and the United States Attorney's Office in the Southern District of New York. The argument's legal rationale is based on the Supreme Court's decision in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), in which the Court vacated a petitioner's state court conviction, which had been entered upon his guilty plea, because a prosecutor's promise to refrain from a sentence recommendation had been broken.[3]

1. Although the statute does not specifically indicate the burden of proof that must be met in order for the certification to be made, the legal standard has been defined as proof of probable cause. *First Nat'l City Bank of New York v. Aristeguieta,* 287 F.2d 219 (2d Cir. 1960), *vacated on other grounds,* 375 U.S. 49, 84 S.Ct. 144, 11 L.Ed.2d 106 (1963); *In re Extradition of Gonzalez,* 217 F.Supp. 717 (S.D.N.Y.1963).

2. At the outset of the hearing, the Government called a witness, Paul Chouinard, former vice-chairman of the Quebec Securities Commission, who positively identified the defendant as the John Peter Galanis who appeared before him in 1971 or 1972 in connection with a proceeding before the Commission involving

Champion Savings Corporation. Although Chouinard was cross-examined, the defendant has never seriously disputed in this proceeding that he is the person named in the Canadian information.

3. The *Santobello* holding specifically applies to prosecutorial promises that induced guilty pleas. As the testimony in this case revealed, the possibility of extradition was not part of the plea negotiations between the Government and the defendant. Since extradition was not discussed until after the defendant had pleaded guilty, whatever assurances he received regarding United States involvement in his extradition induced, at most, his continued coopera-

In *Santobello*, the Court stated:

. . . the adjudicative element inherent in accepting a plea of guilty must be attended by safeguards to insure the defendant what is reasonably due in the circumstances. Those circumstances will vary, but a constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.

*Id.* at 262, 92 S.Ct. at 499. A court reviewing a claim of a violated plea agreement must determine the precise terms of the bargain, assess the claim of breach, and, if the inquiry indicates that the promise has been broken, fashion the proper remedy. The task, as *Santobello* states, is to determine "what is reasonably due in the circumstances." See, *e. g., United States v. Alessi,* 544 F.2d 1139 (2d Cir. 1976); *United States v. Alessi,* 536 F.2d 978 (2d Cir. 1976); *United States v. Papa,* 533 F.2d 815 (2d Cir. 1976); *Geisser v. United States,* 513 F.2d 862 (5th Cir. 1975).

A. *The Agreement*

One uncontroverted fact emerging from the record of this case is that the defendant has been an unusually cooperative Government informant and witness. The Assistant United States Attorney in charge of the securities investigations involving the de-

fendant described his cooperation as "overwhelming." As a direct result of his assistance, the United States Attorney's Office for the Southern District of New York developed nearly twenty different investigations, and obtained numerous indictments, convictions, and additional informants. When the defendant was sentenced, Assistant United States Attorney Brodsky described the information furnished by the defendant as "completely candid and honest," and represented to the Court that Galanis had persisted in his cooperation despite at least two verified threats to his and his family's safety.

■ The critical issue this Court must determine is what the defendant was promised in return for his cooperation. The record developed during the hearing provides abundant evidence, not all of which is clear.[4] The evidence comes from three principal sources—Brodsky's testimony, defense counsel's representations to the Court, and contemporaneous written documents purporting to set forth the agreement.

The issue was initially joined over a rather narrow dispute—whether the extradition proceeding violated a plea bargain between Galanis and the United States that barred "the use of any information supplied to the United States by Mr. Galanis."[5] This statement of the agreement is repeated throughout defendant's submissions to this Court.[6] And this view of the agreement as

---

tion. It may well be that "what is reasonably due" a defendant in the context of a cooperation bargain is different from what is due with regard solely to a plea bargain. For the purposes of deciding this case, however, I will assume *Santobello* applies to defendant's claims just as it would in circumstances where the disputed terms of the bargain related only to the consideration for a defendant's guilty plea.

4. Much of this confusion could have been avoided by adherence to more orderly prosecutorial procedures. Throughout this proceeding the Government has never offered any explanation why a written statement of its agreement with Galanis was not prepared when the bargain was struck in 1971. If such a document were available, it would have significantly facilitated judicial resolution of the disputed terms of the bargain.

In the last year nearly a dozen judges in this Circuit have had to preside over what Judge

Lumbard has described as a "distressing spate of litigation" arising from a similar dispute over the scope of a single plea bargain. *See United States v. Alessi, supra; United States v. Papa, supra.* I have no doubt that other courts will also have to review Galanis' claims after judgment is entered in the pending case, as the defendant continues to pursue his legal remedies. In the future, the Government would be well advised to reduce plea agreements and post-plea cooperation agreements to written form, at least in cases involving defendants with complicated criminal activities.

5. This description of the agreement appears on the first page of the first motion defendant filed in this action. Defendant's Motion to Dismiss, November 22, 1976, at 1.

6. *See, e. g.,* Defendant's Motion to Dismiss, November 22, 1976, at 1; Affidavit of Paul Grand, November 22, 1976, at ¶ 1, ¶ 3(b), ¶ 4, ¶ 7; Defendant's Memorandum in Support of

barring only use of Galanis' information has been expressed by the Government throughout this proceeding.

After the hearing, however, defense counsel's position changed. In his post-hearing memorandum, defendant abandons his earlier position, and instead pleads in the alternative. Specifically, the defendant now argues that, in return for his cooperation, the Government agreed not to *participate* in any extradition proceeding based on charges involving transactions the defendant disclosed to the Government. Alternatively, the defendant argues that if the agreement was only not to disclose information received from Galanis, then the Government has not proved that the evidence on which the Canadian charge is based is wholly independent from the immunized information.

This shift in position is troublesome. Although no lawyer should be reluctant to advance additional arguments on behalf of his client, defense counsel's role in the context of this case is not simply that of an advocate. Attorney Grand, acting on behalf of the defendant, was an active participant in the negotiations that led to the agreement between the United States and the defendant. Despite the defendant's post-hearing claim that the agreement prevents Government *participation* in the extradition proceeding, the fact remains that the only sworn testimony before the Court that purports to state the defendant's own view of the plea bargain at the time it was made is contained in Attorney Grand's affidavit, which clearly indicates that the defendant bargained only for a Government promise that no information he disclosed to the Government would be *used* against him in any subsequent proceeding to which the United States was a party.

The only evidence in the record that gives any support to the defendant's belated claim that the agreement precludes Government participation in an extradition proceeding is found in the testimony of Assist-

ant United States Attorney Brodsky before this Court. Brodsky testified that Galanis agreed to cooperate completely with agencies of the United States concerning his activities, and that he agreed to plead guilty to two felony indictments, which would expose him to maximum penalties of a ten-year prison sentence and $20,000 in fines. In return for his guilty pleas and his cooperation, the defendant was given what Brodsky now characterizes as "complete transactional immunity for all of the offenses which he gave us information about." (Tr. 36. Unless otherwise indicated, transcript citations refer to the hearing of December 3, 1976.)

Defendant concedes that the actual agreement as made prior to his guilty pleas contained no provision for protection from extradition or foreign prosecution.[7] Evidently neither subject was discussed (Tr. 37–39). The guilty pleas were entered separately, one in 1972, the other in early 1973. The defendant was sentenced for both crimes on February 2, 1973. He served six months of a five-year prison sentence, and is now on probation.

Four days after Galanis' sentencing, the Canadian information was filed, and shortly thereafter the Canadian authorities made known to the United States their intention to seek the extradition of Galanis. The defendant does not dispute that the first conversation between Government counsel and his attorneys concerning extradition took place only after this intention had become known—approximately a year and a half after his plea bargain was struck and clearly after he had pleaded guilty. At the hearing, Brodsky recalled the conversation, in response to questioning by the Court. He stated that Galanis' attorneys asked him whether he believed the plea agreement should be modified to cover United States involvement in an extradition request. Brodsky testified that he responded, "I don't think you need anything more on this

the Motion to Dismiss, November 22, 1976, at 1; Reply Memorandum, December 2, 1976, at 2.

7. Defendant's Post-Hearing Memorandum at 9.

agreement to cover you. I think you're covered." (Tr. 41).

Brodsky also indicated that, even though extradition had never been discussed when Galanis' plea bargain was negotiated, he nevertheless felt, at the time of defense counsel's inquiry after the pleas, that the agreement had provided some protection for the defendant from an extradition proceeding (Tr. 42). In explaining to this Court what he felt that protection was, Brodsky totally confused use immunity, which clearly was granted, with transactional immunity, which defendant now claims he received even as to extradition proceedings. Brodsky testified, " . . . my understanding is that we have given him complete transactional immunity, that means we can't use the fruits of what—use either his testimony or the fruits of his testimony against him in a proceeding in which the U.S. government is a party." *Id.*

It is unclear whether Brodsky meant that the bargain prohibited any United States participation in an extradition proceeding, as defendant now claims, or whether he meant only that the non-disclosure agreement included a prohibition against use of immunized information for the purposes of an extradition proceeding. The testimony can also be interpreted as the expression of Brodsky's opinion that the bargain in effect, though not in terms, precluded Government participation in extradition because he did not think it would be possible for the Government to participate without disclosing immunized information.

Since the precise import of Brodsky's testimony is ambiguous, it must be viewed in light of the contemporaneous written documents he prepared setting forth the agreement. The first of these documents is a letter from United States Attorney Whitney North Seymour, Jr. to John Keeney, Chief of the Frauds Unit at the Department of Justice. The letter is dated April 26, 1973, and was therefore written approximately two months after the defendant was sentenced. The letter, which was prepared by Brodsky, states that Galanis had been given informal immunity, and that he was expected to testify as a Government witness in an upcoming trial, *United States v. Zane,* 73 Cr. 192 (S.D.N.Y.1973), scheduled to begin on May 7, 1973. The letter contains the following paragraph:

> Our request to you is three-fold: first, to undertake to represent to the Canadian authorities the detriment to our pending and on-going prosecutions. . . . if Galanis is prosecuted further in Canada at this time; second, if the Canadian authorities believe that Galanis should be prosecuted now, that he should be considered to have been given immunity by our government by reason of his statements to us after the arrangement was entered into; and finally, if the Canadian authorities still insist, that we undertake to allow Galanis sufficient time in the United States to complete all of his testimony in prosecutions by this office.

If Brodsky had struck a bargain with the defendant that included protection from United States participation in extradition, this is indeed a strange paragraph. Although the letter communicates the United States Attorney's opposition to the prompt extradition of the defendant, it is devoid of any indication that Brodsky thought the United States could not extradite Galanis because to do so would violate a plea agreement. The letter specifically contemplates extradition, albeit at some later, more convenient, date.

Brodsky's testimony in this Court reveals his state of mind at the time he wrote the letter. He testified that "I was extremely concerned by the fact that, at what was expected to be, and turned out to be, a major and long trial, Galanis was suddenly going to be either snatched away from the government and put—extradition proceeding was going to be commenced, or he was not going to be an effective witness because he was going to have the threat of these proceedings hanging over his head. . . . " (Tr. 30).

Given his apparent concern over the extradition request, Brodsky would almost certainly have advanced the plea agreement as a bar to United States participation in

the extradition proceeding if he actually believed at that time that non-participation was one of the terms of the bargain. The natural inference from the letter and from his testimony is that he did not believe the plea bargain would prevent United States participation in Galanis' extradition.

A second document, drafted one month later, confirms this conclusion. In the course of Galanis' testimony as a Government witness in *United States v. Zane, supra,* District Judge Wyatt instructed Brodsky to prepare a written statement of Galanis' plea agreement, which would then be turned over to defense counsel in that trial for the purposes of cross-examination. The statement reads:

At a meeting on this date among Paul Grand, Galanis, and the undersigned, the following previous oral understandings were reduced to writing:

1) Galanis' agreement as of July 1971 re: Pleading to 2 felony indictments covered all subject matters which he has disclosed to the SEC and the U.S. Attorney.

2) He has effectively been given informal immunity on all such subject matters, including the matter of his involvement with Champion S & L in 1971 in Canada.

3) If the Court allows questioning on the Canadian involvement in the *U. S. v. Zane, et al.* proceeding, the Government will represent to the Court that it will not allow any such questions and answers or any information previously furnished to the Government to be used against Galanis in any extradition proceeding, or otherwise, to which the Government of the United States is a party.

The statement is initialed by Brodsky.

This document was apparently prepared with the knowledge of the defendant and his attorney, and was submitted to a United States District Court as an accurate statement of the plea agreement. By its terms, the statement does not bar Government involvement in an extradition proceeding; instead it specifically contemplates United States participation in an extradition proceeding, and only promises non-disclosure of information in such a proceeding, in effect, use immunity as to extradition proceedings. The defendant has never disputed this document's accuracy or completeness, and in fact, submitted a copy of the statement in support of his motion to dismiss.

 Based on these two documents, Brodsky's testimony, and the defendant's representations, it is clear that the consideration the defendant bargained for and received in exchange for his guilty pleas and cooperation was immunity from United States prosecution for crimes concerning any matters he discussed with the American authorities, and a Government promise to insure that any information thus obtained would not be used against him in any proceeding, including extradition, to which the United States would be a party. In other words, as to extradition, Galanis received use immunity only. The evidence shows this and no more. Moreover, even if the record were less certain than it is, a court should not lightly infer that an Assistant United States Attorney would undertake to waive on behalf of the United States the obligations imposed by an international treaty. Had the prosecutor purported to forego United States participation in an extradition proceeding, specification of such an extraordinary agreement would surely have been confirmed in writing; indeed, defendant's experienced counsel would have insisted on proper documentation.

## B. *The Claim of Breach*

The question remains whether the agreement protecting defendant from disclosure of his immunized information and testimony in connection with extradition has been violated. Defendant contends that it has. He argues that information obtained from him was given to the Canadians. The Government disputes that contention.

Since the defendant was given use immunity, he contends that the Government must shoulder the burden of proving that the evidence relied upon by the Canadians in this proceeding is derived from sources wholly independent of the immunized information and testimony. *Kastigar v. United*

*States,* 406 U.S. 441, 460, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1971); *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

In an attempt to discharge this burden, the Government relies on the testimony of three witnesses at the hearing. The first witness, Brodsky, testified that he never spoke to any Canadian investigators about the information he learned from Galanis (Tr. 33). A second witness, Lester Green, special counsel to the SEC, was assigned to investigate matters involving Galanis in August, 1970. Of all the American investigators, Green appears to be the only official who has been continuously involved with Galanis from the outset of the American investigation of him through his long period of cooperation. Green testified that the SEC was contacted twice by Canadian investigators interested in Galanis. On both occasions, virtually no assistance was given, and neither contact is a basis for finding a breach of the plea bargain.

Green stated that in 1972 "some people from Canada" came to the offices of the SEC in Washington to discuss an investigation unrelated to Galanis. While there, they asked Green's superior whether the SEC was familiar with the activities of John Peter Galanis. Green testified that he immediately understood the problem that would occur if the SEC assisted the Canadians. He stated, "I told my superior that I felt it would be ethically improper for me to get involved," and that the "only assistance I provided them was I called down to the file room and asked for public documents . . . to be brought up and put them in a room and I left them, and I did not divulge anything that Mr. Galanis had told me or furnished any documents which Mr. Galanis had given me." (Tr. 110).

The second Canadian request to the SEC occurred in December, 1973. Green testified that at that time he received a call from Jacob Graber of the SEC New York office. Graber explained that two Canadian officials had come to New York and were seeking information concerning Galanis and Champion Savings. Graber knew that Green had been involved in the Galanis investigations, and wanted to know "if I was in a position to furnish any information for the Canadians." (Tr. 115). Green stated that he discouraged Graber, and told him that neither he nor anyone at the Department of Justice who had worked with Galanis during the period of his cooperation could provide the Canadians any assistance.

Green's testimony is corroborated by the testimony of George Prenovost, Director General of the Inspection Service of the Department of Consumers, Cooperatives and Financial Institutions of the Province of Quebec. Prenovost directed the Canadian investigation of Galanis, which he described as being virtually complete by December, 1973 (Tr. 54). That month, however, he sent two investigators to New York City to request assistance from the SEC in connection with some recent leads they had developed. They met with Graber, who obtained for them, through the help of a New York City stockbroker, a statement from a trust company, some daily stock quotations, and some serial numbers from several stock certificates. None of this information came from Galanis.

Prenovost testified that his investigators returned to Montreal with that information, expecting to receive at some later date additional information from Graber. After several months had passed, the Canadian official contacted Graber in New York, who explained to him that "there was some agreement, and that he was not able to deliver what he had promised." (Tr. 87). According to Prenovost after that conversation, no further requests for information were made to the United States. When asked whether any of the documents submitted to the United States in support of the extradition request had been obtained "in any way" through the United States or any of its agents or agencies, Prenovost replied convincingly in the negative.

Defendant contends that, in accordance with the standards of *Kastigar,* evidence cannot be presented against a person who has testified under a grant of what amounts to use immunity unless the offeror

of the evidence not only demonstrates that immunized testimony is not being used, but also demonstrates that the evidence presented was obtained from sources independent of the immunized testimony. This latter requirement assures that the immunized testimony was not used even indirectly as a lead to other evidence.

No case appears to have considered whether the *Kastigar* standards applicable when a domestic prosecution (federal or state) is brought against a witness given use immunity apply with equal rigor in the extradition context. See *Zicarelli v. New Jersey State Commission on Investigation,* 406 U.S. 472, 92 S.Ct. 1670, 32 L.Ed.2d 234 (1972), specifically leaving open the somewhat analogous question of whether a witness given use immunity can still assert the privilege against self-incrimination because of a realistic fear of foreign prosecution. See also *In re Cardassi,* 351 F.Supp. 1080 (D.Conn.1972).

■ There are policy reasons for a slightly less exacting procedure. The demanding country, having negotiated a treaty, understandably expects its treaty rights to be recognized, without any dilution based on use immunity agreements to which it is not a party. And the demanding country can in some circumstances be substantially burdened by having to demonstrate to the extraditing magistrate that an independent source exists for all evidence presented in support of extradition. Thus, it may be that when the United States has given a witness use immunity that extends to extradition proceedings, the United States fulfills its obligation simply by negating by clear and convincing evidence that any immunized testimony of the witness has been transmitted to the demanding country. Taken together the testimony of Prenovost, Green, and Brodsky abundantly demonstrates that no information disclosed by Galanis was relayed to Canadian authorities.

Even if a use immunity agreement in the context of extradition requires proof of an independent source for the evidence presented to obtain extradition, that standard has been met here. The bulk of the evidence presented by the Canadian authorities, sufficient to establish probable cause, see Part VI, *infra,* comes from deposition testimony of Theodor Arnold and corporate and banking records available wholly independently of Galanis' testimony. The Government has established that the presentation of evidence in this extradition proceeding does not violate the use immunity agreement with Galanis.

For the foregoing reasons, defendant's motion to dismiss this proceeding, on the ground that the extradition proceeding violates a prior agreement between him and the United States, is denied.

## II. *Applicability of 1971 Treaty*

Before turning to defendant's other motions, at least one of which turns on rights he claims under a United States-Canada treaty, it is important first to determine which international agreement governs Galanis' extradition. On December 3, 1971, at Washington, D.C., representatives of the United States and Canada signed a Treaty on Extradition Between the United States of America and Canada. This treaty went into effect on March 22, 1976. Article 18 of the treaty provides:

(2) This Treaty shall terminate and replace any extradition agreements and provisions on extradition in any other agreement in force between the United States and Canada; *except that the crimes listed in such agreements and committed prior to entry into force of this Treaty shall be subject to extradition pursuant to the provisions of such agreements.* [emphasis added].

T.I.A.S. No. 8237. There is no dispute that the crime with which Galanis is charged was allegedly committed prior to the entry into force of the 1971 Treaty. Thus by the very terms of the treaty this proceeding is governed by the previous extradition treaty in force, Article 10 of the Webster-Ashburton Treaty of 1842, 26 Stat. 1508, as supplemented by the Extradition Conventions of 1889, 1900 and 1951.

■ Galanis argues that notwithstanding this express provision, the 1971 Treaty gov-

erns his extradition. He offers several possible alternative constructions of Article 18 of the Treaty, but none of these detracts from the plain meaning of the words the treaty uses. The general principles Galanis cites—that extradition treaties are generally considered to be retroactive, and that if a treaty fairly admits of two constructions, the more lenient one is preferred—hardly carry any persuasive force here, where the treaty provision is unambiguous and on its face controverts any inference of retroactivity.

The plain meaning of the treaty's words to preclude retroactivity is supported by two persuasive considerations. The first is the letter of submittal of the treaty to the President from Robert S. Ingersoll, Acting Secretary of State. That letter states: "The Treaty is not retroactive in effect." See Message from the President of the United States Transmitting the Treaty on Extradition Between the United States of America and Canada, 93d Cong., 2d Sess. (1974), at p. vi. The second is an affidavit submitted in this case by K. E. Malmborg, Assistant Legal Adviser for Management in the Office of the Legal Adviser, Department of State. He asserts that "all of the provisions on extradition in other agreements in force prior to the 1971 treaty, and not the provisions of the 1971 treaty, apply to crimes listed in such other agreements which were committed prior to March 22, 1976." While such an affidavit is not necessarily determinative, this one accords with the plain language used in the treaty and the statement in the Ingersoll letter of transmittal. *Cf. Greci v. Birknes,* 527 F.2d 956 (1st Cir. 1976).

Finally, although the bulk of the activity in this proceeding has occurred after the effective date of the treaty, the Canadian extradition demand was in fact made on December 10, 1974, well before the effective date of the treaty.

8. The argument made in *Holmes* was in essence "that the turnover of an American citizen for service of a sentence imposed in culmination of an unfair foreign trial is a governmental involvement which the Constitution does not

## III. *Speedy Trial*

The Canadian information and the warrant for the arrest of Galanis were filed in February of 1973, but the instant proceeding did not commence until September of 1976. Galanis argues that the delay of three and one-half years between the information and the formal commencement of the extradition proceeding was due to collusion between the United States and Canada to postpone his extradition until the end of his usefulness to the United States in testifying against other defendants in stock fraud cases here. Galanis claims that the delay has prejudiced him and has violated his constitutional right to a speedy trial.

An extradition proceeding is not a criminal prosecution, and the constitutional safeguards that accompany a criminal trial in this country do not shield an accused from extradition pursuant to a valid treaty. *Neely v. Henkel,* 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); *Ex parte La Mantia,* 206 F. 330 (S.D.N.Y.1913). As Judge Smith stated in *Gallina v. Fraser,* 177 F.Supp. 856, 866 (D.Conn.1959), *aff'd,* 278 F.2d 77 (2d Cir. 1960), *cert. denied,* 364 U.S. 851, 81 S.Ct. 97, 5 L.Ed.2d 74 (1960):

> Regardless of what constitutional protections are given to persons held *for trial* in the courts of the United States or of the constituent states thereof, those protections cannot be claimed by an accused whose trial and conviction have been held or are to be held under the laws of another nation, acting according to its traditional processes and within the scope of its authority and jurisdiction.

The fact that the United States "participates" in the arguable denial of a constitutional protection by surrendering the defendant to the demanding nation does not implicate the United States in an unconstitutional action. *Holmes v. Laird,* 148 U.S. App.D.C. 187, 459 F.2d 1211 (1972), *cert. denied,* 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972).[8]

tolerate." 459 F.2d at 1217. The Court held that the Constitution raises no barrier to surrender of an accused in conformity with an extradition agreement even though the trial in

What we learn from *Neely* is that a surrender of an American citizen required by treaty for purposes of a foreign criminal proceeding is unimpaired by an absence in the foreign judicial system of safeguards in all respects equivalent to those constitutionally enjoined upon American trials.

*Id.* at 1219. The Second Circuit has recently stated that "the Sixth Amendment's guarantee to a speedy trial, limited by its terms to criminal prosecutions, is inapplicable to international extradition proceedings." *Jhirad v. Ferrandina*, 536 F.2d 478, 485 n. 9 (2d Cir. 1976).[9]

■ Galanis asserts that the United States "participated" in the denial of his right to a speedy trial not merely by initiating this extradition hearing, but also by deliberately combining with Canada to delay extradition until his usefulness as a cooperative witness in United States prosecutions had come to an end.[10] This is a more active involvement than surrender alone, and it is possible that in a proper case United States complicity in deliberate action to deny a constitutional right would warrant the relief defendant requests.[11] Under the circumstances of the present case, however, there has been no denial of defendant's Sixth Amendment right to speedy trial even under standards that would govern an American court in a domestic prosecution, because defendant has shown no prejudice. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). The only prejudice defendant cites is the unavailability of a defense witness. However, the affidavit of defendant's counsel reveals that efforts to locate that witness began in 1973, only a few months after the date of the Canadian information. Even if the United States had proceeded promptly in extraditing Galanis, this witness would have been unavailable. His continued absence in 1976 does not establish prejudice.

### IV. Double Jeopardy

■ Defendant contends that his guilty pleas to two specific crimes were intended, according to his plea bargain, to be in satisfaction of all crimes he disclosed to the American authorities. Evidently during the course of his cooperation he gave investigators information concerning his Canadian activities. On this basis, defendant now contends that the double jeopardy clause

the foreign nation did not afford defendants the protections of the Bill of Rights.

9. *Jhirad* dealt with the application of the statute of limitations where the treaty gave the accused the benefit of the shorter period available in either the requesting country or the asylum country. In the absence of a treaty provision, the statute of limitations defense may not be raised in an extradition proceeding. *Merino v. United States Marshal*, 326 F.2d 5 (9th Cir. 1963). Thus *In re Mylonas*, 187 F.Supp. 716 (N.D.Ala.1960), cited by defendant, is not in point, because the applicable treaty provided that "A fugitive criminal shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of either of the surrendering or the demanding country, the criminal is exempt from prosecution or punishment for the offense for which the surrender is asked." There is no such provision in the Webster-Ashburton Treaty, as supplemented.

10. There is very little evidence to support this allegation. Arguably it is a reasonable inference from the evidence of Brodsky's expressed preference to his superiors that Galanis' extradition be delayed until he had testified as ex-

pected coupled with the fact that a considerable delay actually occurred.

11. If, for example, United States agents had participated in forcibly extracting a confession from a defendant, or had ransacked his house and turned his private papers over to the demanding country, a court might refuse to extradite the accused to enforce his right to be free from unconstitutional United States action. Ironically, that sanction, tantamount to dismissal of a domestic indictment, would extend the accused even more protection than he would have in a domestic prosecution, where exclusion of the unconstitutionally obtained evidence would be the limit of relief. Since the domestic sanction for violation of the speedy trial right is dismissal of the indictment, *see Barker v. Wingo*, 407 U.S. 514, 522, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), refusal to extradite would not present the same anomaly. Since denial of extradition denies a foreign state its treaty rights, use of this remedy to redress unconstitutional actions of United States officials would always have to be weighed with care.

bars his extradition. He also claims a treaty right to protection from extradition based on the 1971 treaty,[12] but as has been previously discussed, the Webster-Ashburton Treaty rather than the 1971 treaty governs his extradition.

Neither the Constitution nor the Webster-Ashburton Treaty confers on Galanis the right he claims.

> There is no constitutional right to be free from double jeopardy resulting from extradition to the demanding country.
>
> \* \* \* \* \* \*
>
> The Fifth Amendment right not "to be twice put in jeopardy of life or limb" is available only to prosecutions in this country. The essential elements of a plea of double jeopardy are identity of successive sovereigns and an identity of alleged offenses. (citations omitted).

*In re Ryan*, 360 F.Supp. 270, 275 (E.D.N.Y. 1973), *aff'd*, 478 F.2d 1397 (2d Cir. 1973). This Circuit has held that the Webster-Ashburton Treaty cannot be read to provide protection from extradition even where double jeopardy would have been applicable had the prosecution occurred in the United States. *United States ex rel. Bloomfield v. Gengler*, 507 F.2d 925 (2d Cir. 1974).

> "A sovereign nation," the Supreme Court declares, "has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." "The jurisdiction of the nation, within its own territory, is necessarily exclusive and absolute; it is susceptible of no limitation, not imposed by itself." And "[a]ll exception . . . to the full and complete power of a nation within its own territories must be traced up to the consent of the nation itself. They can flow from no other legitimate source."

*Holmes v. Laird*, 148 U.S.App.D.C. 187, 459 F.2d 1211, 1216 (1972), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972). (citations omitted).

## V. Admissibility of Evidence

 The admissibility of evidence in an extradition hearing is governed by 18 U.S.C. § 3190, which provides:

> Depositions, warrants, or other papers or copies thereof offered in evidence upon the hearing of any extradition case shall be received and admitted as evidence on such hearing for all the purposes of such hearing if they shall be properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof that the same, so offered, are authenticated in the manner required.

The evidence offered against Galanis is basically in two parts. The first (Govt. Exhibit 2) consists of the statements of Theodor Arnold made in Zurich, Switzerland, before a Zurich police officer and a Canadian securities enforcement official, and the second (Govt. Exhibit 3) consists of depositions, and accompanying exhibits, taken in Canada in connection with the investigation of the matter of Champion Savings Corp., Ltd. Galanis objects to the admissibility of all these documents on the ground that they do not conform to the authentication requirement of § 3190.

Galanis apparently does not dispute that the certificates of the consular officials affixed to Exhibits 2 and 3 are in proper form. He argues that though these certificates establish a *prima facie* case of authentication "so as to entitle [the evidence] to be received for similar purposes by the tribunals of the foreign country," he can prove that the documents are in fact insufficiently authenticated for introduction into evidence in Canadian tribunals. At the extra-

---

12. Article 4 of the 1971 Treaty provides:
 (1) Extradition shall not be granted in any of the following circumstances:
 (i) When the person whose surrender is sought is being proceeded against, or has been tried and discharged or punished in the territory of the requested State for the offense for which his extradition is requested.

dition hearing he was permitted to introduce the testimony of an expert in Canadian law, who stated that the Government's exhibits would not be admissible in Canada, either at a preliminary hearing on probable cause or at an extradition hearing.[13] To counter this evidence the Government offered the testimony of its own expert, who concluded that the Arnold declaration (Govt. Exhibit 2) would have been admissible at a Canadian extradition hearing.

Upon full consideration of the law, it is my opinion that all the testimony relating to the admissibility or inadmissibility of Exhibits 2 and 3 at a hearing for similar purposes in Canada was improperly received and should be stricken. Where the certificate of the principal diplomatic or consular officer is in proper form, no inquiry is permitted into whether the rules of evidence of the demanding state would allow the admission of the evidence.

■ The statute comprehends two concepts, certification and authentication. Certification is the act performed by the United States officer, attesting that authentication is proper.[14] Authentication is entirely separate. If a document is "properly and legally authenticated" so as to entitle it to be "received for similar purposes by the tribunals of the foreign country," then it is admissible in this proceeding under § 3190. The phrase "for similar purposes" has been interpreted to mean "for the purposes of a hearing on criminality" rather than an extradition hearing. *In re Lincoln*, 228 F. 70 (E.D.N.Y.1915), aff'd, 241 U.S. 651, 36 S.Ct. 721, 60 L.Ed. 1222 (1915);

*In re McPhun*, 30 F. 57 (C.C.S.D.N.Y.1887); *In re Fowler*, 4 F. 303 (C.C.S.D.N.Y.1880).

■ The present issue is whether the language of the statute providing that the consular certificate shall be "proof" of proper authentication means conclusive proof, or merely *prima facie* proof which the defendant may rebut by calling experts in the law of evidence of the demanding state to testify that the documents are not properly authenticated.[15] Defendant cites no case where evidence has been received to rebut a proper certification of authenticity, nor has this Court found one. What case law there is has generally concerned a defendant's attempt to prove that the certified evidence would not be admissible at common law or under the law of the state in which the extradition proceeding takes place and therefore would be insufficient to meet the requirements of the pertinent treaty. See, *e. g., Elias v. Ramirez*, 215 U.S. 398, 30 S.Ct. 131, 54 L.Ed. 253 (1910); *United States v. Artukovic*, 170 F.Supp. 383 (S.D.Cal.1959).

■ The language of several cases from the era shortly after the enactment of what is now § 3190 [16] indicates a belief that Congress intended consular certification to provide absolute proof of underlying authenticity:

It seems to me that the amending act [now codified in § 3190] was clearly designed to prescribe a single test of admissibility of evidence in proceedings in this country . . . In other words, the amending statute intended to make the consular certificate the *final and controlling guide* in determining the admissibili-

---

**13.** Defendant also makes an admissibility argument based on Article 10(2) of the 1971 Treaty, but since that treaty is not applicable for the reasons stated above, no discussion of this point is necessary.

**14.** The courts have recognized that Congress did not expect the consular official to be an expert in the law of the demanding state:

Since the Ambassador could not, of his own knowledge, know the law of Israel, he had to rely on the Israeli authorities to inform him. When they sent him the testimony at issue for extradition purposes they were informing him that he could properly certify the documents.

*Shapiro v. Ferrandina*, 355 F.Supp. 563 (S.D.N.Y.1973), aff'd, 478 F.2d 894 (2d Cir. 1973).

**15.** If any defect appears in the certification, the statutory mode of proof is not exclusive, and other evidence may be introduced to prove that the documents are in fact authenticated so as to entitle them to be received as evidence of criminality in the foreign country. *Desmond v. Eggers*, 18 F.2d 503 (9th Cir. 1927), and cases cited therein.

**16.** Section 3190 derives from R.S. § 5271, Act of August 3, 1882, ch. 378, § 5, 22 Stat. 216.

ty of testimony before the extradition commissioner. [emphasis added].

*Ex parte Schorer*, 197 F. 67 (E.D.Wis.1912). Under [§ 3190], the prosecution may rely upon the certificate of the diplomatic or consular officer, which, if in conformity with the statute, is of itself absolute proof that the papers so certified are receivable in the foreign country in proof of criminality.

\* \* \* \* \* \*

The evident meaning of [§ 3190] is that whatever papers are so authenticated as to be receivable in evidence in the foreign country as proof of the criminality of the accused may be received in evidence here; and that our consul's certificate that they are so authenticated as to be entitled to be used for that purpose there shall be conclusive proof on that point.

*In re McPhun*, 30 F. 57 (C.C.S.D.N.Y.1887). Two other cases, *In re Behrendt*, 22 F. 699, 700 (C.C.S.D.N.Y.1884), and *In re Fowler*, *supra* at 311, state that the certification of the diplomatic official is absolute if in proper form, whatever may be the tenor of underlying authentication of the foreign officials. *Behrendt* states that correct certification remedies any defects in the previous authentication.

The matter would be entirely free from doubt were it not for arguably conflicting statements in the Second Circuit's decision in *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir. 1973). In that case defendant challenged the sufficiency of the certification of documents presented to the extraditing magistrate. The certificates authenticated only provisions of foreign law and certain charging documents, but not other documents submitted as evidence of probable cause. Judge Friendly began consideration of defendant's objection with the unqualified observation that the certification specified in § 3190 is "conclusive," *id.* at 903, citing 6 Whiteman, Digest of International Law 969–70 (1968), and 1 Moore, Extradition 499–501 (1891). Then, turning to the apparently limited coverage of the certification, Judge Friendly inferred from circumstances in the record that the certifying

ambassador had intended to certify the evidence documents, as well as the charging documents. 478 F.2d at 904. Concluding the discussion, he expressed the court's unwillingness to release the defendant "in the absence of any showing that the [evidence] documents were not authentic or not of the sort admissible in [the demanding country] for purposes of establishing the sufficiency of the evidence." *Ibid.* It is this last thought that defendant seizes upon as indicating that he should have an opportunity to present evidence to show that the documents certified as authentic in this case are in fact not authentic, *i. e.*, that they would not be admissible to establish probable cause in a Canadian court.

Even if the dictum in *Shapiro* contemplates receiving defendant's evidence to negate authenticity in some circumstances, it offers no basis for doing so to rebut a proper certificate that embraces evidence of probable cause. At most *Shapiro* invites evidence when a serious question exists as to whether the critical evidence of probable cause has been certified at all. In such circumstances authenticity remains an issue, and defendant's evidence on that subject may well be appropriate. But where, as here, the certificate is complete, *Shapiro* itself states that the certificate is conclusive.

To give conclusive effect to the diplomatic certification and preclude proof of lack of authenticity is, as Wigmore says, an extreme step. 4 Wigmore, Evidence (Chadbourn Revision) § 1348; see generally §§ 1345–52 and 2492 on conclusive preferences and presumptions. The drastic nature of applying such a rule is particularly apparent in a case such as this one, where the defendant's offer of proof is substantial. But there are policy reasons for adhering to the consistent interpretation of § 3190 that a formally correct certification of an appropriate diplomatic officer is conclusive on the issue of authentication.

Whenever any of the state or federal judicial officers authorized to conduct extradition hearings, 18 U.S.C. § 3184, has to venture into the unfamiliar realm of decid-

ing how a foreign jurisdiction would interpret its own law, he may encounter uncertainty beyond the expected vagaries of domestic law. Here the stakes are higher than usual, for the risk of error is borne not by private litigants but by the foreign government itself. A misinterpretation of a foreign rule of law in an extradition proceeding deprives the foreign government of its treaty right to extradition and could have ramifications on relations between the United States and the foreign nation.

The merits of the defendant's admissibility argument will vary in each individual case, of course. If he is clearly wrong and the American court rejects his argument, the foreign government would have been put to the hardship of meeting the challenge, probably at considerable expense, despite the general rule laid down by Congress and the Supreme Court that the government may rest on its documentary evidence.[17] If the defendant's interpretation of foreign law has arguable merit, an erroneous decision in his favor would risk offending the foreign government that will have been denied its lawful treaty right. But if the defendant is right that the evidence against him would be inadmissible in the courts of the foreign country, the consequence of a decision against him is only that he will have to present his defense to the foreign courts, which *ex hypothesis* will agree with his view of the law, or face trial on other admissible evidence that was not used to obtain extradition. The possibility of serious international repercussions from improperly releasing the defendant sufficiently outweighs the consequence of sending him to the foreign country to present a defense based on foreign law.

Further, Galanis cannot claim that the documents offered are inherently untrustworthy, for it has frequently been held that even unsworn statements are admissible when properly certified. *Elias v. Ramirez*, 215 U.S. 398, 30 S.Ct. 131, 54 L.Ed. 253 (1910); *Ex parte Glaser*, 176 F. 702 (2d Cir. 1910). His only attack is on the fact that

the Canadian officials who authenticated the documents hold positions other than those specified in the Canadian Criminal Code for persons qualified to take deposition evidence. This is an argument that "savors of technicality." *Bingham v. Bradley, supra,* 241 U.S. at 517, 36 S.Ct. 634; *Shapiro v. Ferrandina, supra,* 478 F.2d at 904.

> [I]f the certificates, signatures, etc. are in substantial conformity to the requirements of the statute, and give reasonable assurance of authenticity, it is sufficient.

*In re Neely,* 103 F. 626, 630 (C.C.S.D.N.Y. 1900), *aff'd sub nom. Neely v. Henkel,* 180 U.S. 126, 21 S.Ct. 308, 45 L.Ed. 457 (1901). *See also Grin v. Shine,* 187 U.S. 181, 23 S.Ct. 98, 47 L.Ed. 130 (1902). If evidence were ever to be admitted to rebut a consular official's certification of authenticity, the issue as to authenticity would have to involve some claim affecting the integrity of the proffered documentation.

## VI. *Probable Cause*

Galanis is charged with the crime of fraud in violation of § 338 of the Canadian Criminal Code, which provides for imprisonment of up to ten years for "[e]very one who, by deceit, falsehood or other fraudulent means, whether or not it is a false pretense within the meaning of this Act, defrauds the public or any person, whether ascertained or not, of any property, money or valuable security." The Canadian information charges that Galanis, by deceit, falsehood or other fraudulent means, defrauded Champion Savings Corporation Ltd. and its creditors of securities valued at Can. $1,600,000.00 or of the proceeds from the sale or transfer of such securities in that amount.

There is ample evidence to support a finding of probable cause that Galanis committed the crime of fraud in violation of § 338. Without elaboration of all the details of the fraudulent scheme, which are set forth at some length in the voluminous deposition evidence and attached documents

---

17. *Bingham v. Bradley,* 241 U.S. 511, 517, 36 S.Ct. 634, 60 L.Ed. 1136 (1916).

submitted as Government Exhibits 2 and 3, the evidence shows the following:

John Peter Galanis was vice president and director of Champion Savings Corporation Ltd. (Champion) in 1971 when the offense was committed. He also indirectly controlled Champion through his control of Champion's major shareholder, Jason Investment Holdings, Ltd. Under his instructions the investment portfolio of Champion, which had mainly consisted of bonds, was gradually converted by November of 1971 through a series of transactions effected through Bank Widemann & Co. of Zurich, Switzerland. Champion purchased a total of Can. $1,175,000 in Kassaobligations (bank debentures) of Bank Widemann. These Kassaobligations were sent in for redemption in November of 1971. On November 17, 1971, on instructions from Champion, the Champion account at Bank Widemann was debited in the amount of Can. $1,600,-000, which was credited to the account of an entity called BWC Trust Reg. for the purchase of Can. $1,600,000 in BWC Trust Kassaobligations. Sixteen BWC Trust Kassaobligations were purchased in denominations of Can. $100,000 each. On February 17, 1972, an additional Kassaobligation for Can. $100,000 was purchased. These BWC Trust Kassaobligations formed the bulk of the Champion Savings portfolio. They were to carry 9% interest, payable semi-annually, and were to mature in five years. According to certain letters addressed to Champion on Bank Widemann stationery and bearing what appeared to be the signature of a Bank Widemann officer, Bank Widemann guaranteed payment on maturity of the principal amount of the Kassaobligations.

The Bank Widemann guarantee, however, was a forgery. Further, the financial statements of Bank Widemann prepared to enable evaluation of the worth of the guarantee had been altered to remove the Swiss franc currency sign, leading the reader to believe that amounts shown were in dollars. The first semi-annual interest payment on the BWC Kassobligations was not paid when due, and in fact no interest was ever paid. The value of the BWC Kassaobligations, representing the bulk of Champion's portfolio, declined for all practical purposes to zero. Champion went into receivership.

Meanwhile, the Can. $1,600,000 received by BWC Trust for the purchase of the Kassaobligations had been paid out in a series of transactions to a number of persons and entities, including, among others, Woodruff & Co., which was apparently a personal holding company for John Peter Galanis, and Jason Investment Holdings, Ltd., also controlled by Galanis. Some of the amount went to Galanis in the form of traveler's checks. The evidence of Galanis' involvement in the scheme more than supports a finding of probable cause.

Galanis' final argument is that the evidence at most shows the commission of a crime in Switzerland rather than in Canada, which would not be an offense extraditable under the United States-Canadian treaty. This argument is without merit. Champion Savings Corporation Ltd. was a Canadian corporation with offices in Montreal. There is evidence that Galanis made business trips to Montreal on Champion matters during the period of time charged in the indictment. The misrepresentations about the Bank Widemann guarantee were made to persons in Canada. The effects of the fraud were clearly felt by investors and creditors in Canada. Under recognized principles of international law, Canada has jurisdiction to punish for this offense. Restatement, Foreign Relations Law of the United States, §§ 17, 18, 20.

A very similar issue involving extradition to Canada for the offense of obtaining money by false pretenses was decided in *Ex parte Hammond*, 59 F.2d 683 (9th Cir. 1932), *cert. denied*, 287 U.S. 640, 53 S.Ct. 89, 77 L.Ed. 554 (1932). In that case the appellant claimed that the offense, if any, was committed in the state of California and not in Canada since he did not actually "obtain" any money by false pretenses or otherwise until the money was deposited in his California bank. He also argued that he made the false pretenses at Chicago after he had left Canada and never returned there, and

thus was not a fugitive from Canada. The court disposed of these arguments by citing *Ford v. United States*, 273 U.S. 593, 623, 47 S.Ct. 531, 541, 71 L.Ed. 793 (1927), a case in which the Supreme Court had relied on James Bassett Moore, a recognized expert in international law and Judge of the Permanent Court of International Justice, for the following proposition:

> The principle that a man, who outside of a country willfully puts in motion a force to take effect in it, is answerable at the place where the evil is done, is recognized in the criminal jurisprudence of all countries. And the methods which modern invention has furnished for the performance of criminal acts in that manner has [sic] made this principle one of constantly growing importance and of increasing frequency of application.

The *Ford* rule, as reiterated in an extradition context in *Hammond*, is that "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a State in punishing the cause of the harm as if he had been present at the effect, if the State should succeed in getting him within its power." 273 U.S. at 620–21, 47 S.Ct. at 540; see also *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911); *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972); *Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968), *modified*, 405 F.2d 215, *cert. denied*, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *United States ex rel. Eatessami v. Marasco*, 275 F.Supp. 492 (S.D. N.Y.1967); *Re Chapman*, 5 C.C.C. 46, 11 C.R.N.S. 1 (Ont.Ct.App.1970).

For the foregoing reasons the Court finds that there is probable cause to believe that Galanis committed the offense as charged and that he has no valid defense to extradition. Accordingly, it is

ORDERED that this Certification and Order, together with a copy of all testimony heard and evidence submitted in this proceeding, be forwarded by the Clerk of this Court to the Secretary of State so that a warrant may issue upon the requisition of the proper authorities of the Government of Canada for the surrender of the defendant John Peter Galanis; and it is further

ORDERED that the defendant John Peter Galanis shall continue in the custody of the United States Marshal for the District of Connecticut under the conditions of bond now in effect to await surrender pursuant to such warrant.